JAMES WOOD V. THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY.

1. INDIAN TREATIES; *Powers of President and Senate.* The question whether the President and Senate of the United States have power by treaty to dispose of Indian lands, is not an open one. That they have such power, and the power to prescribe the manner in which Indian ·lands may be sold or conveyed, seems to have been settled by all the departments of the federal government.

2. OSAGE CEDED LANDS; *Status in July* 1871. A person who on July 22d, 1871, settled upon and occupied a certain piece of land belonging to the United States and situated within the Osage ceded lands, had no right to pre-empt the same, for such lands were not at that time subject to pre-emption.

3. TRESPASSER ON GOVERNMENT LANDS; *Action to Quiet Title.*  A person in actual possession and occupancy of a piece of government land, but who is merely a trespasser thereon, cannot maintain an action to quiet his possession or occupancy thereof against any other person.

## *Error from Labette District Court.*

ACTION brought by. *Wood,* under § 594 of the civil code, to quiet title.   The action was commenced against the L. L. & G. Railroad Company and the *M. K. & T. Railway Co.* Plaintiff alleges settlement, improvement and possession by himself, of land in question, July 22d, 1871, and his qualifications as a pre-emptor; that on the 13th of September, 1871, he appeared before the register and receiver of the local land office at Humboldt, within which district the land is situated, and offered to make the proof, and do all other acts necessary to entitle him to make pre-emption of the public lands of the United States, but that the register and receiver refused to entertain said application, and did reject the same, etc.; and that defendants set up and claim some right or interest in the land adverse to the claim and right of the plaintiff, etc.   The L. L. & G. Rld. Co. filed its disclaimer.   The *M. K. & T. Railway Co.* by its answer denied any claim, estate, possession or right to possession in. said plaintiff, and set up a legal and equitable claim to the same by virtue of the Treaty made by and between the United States and the Great and Little Osage Tribe of Indians on the 29th of September, 1865, and proclaimed with amendments on the 21st of January, 1867, the act of congress approved July 25, 1866, and its compliance with all the provisions, conditions and requirements of said act.   The facts on the part of plaintiff and defendant respectively were agreed upon; and when the case came on for trial, the defendant objected to the introduction of any evidence, on the ground, 1st, that plaintiff's petition did not state facts sufficient to constitute a cause of action, and 2d, that the court had no jurisdiction of the subject-matter of the action.   The district court sustained the first objection; and plaintiff not asking an amendment, judgment final was

rendered in behalf of the defendant. *Wood* brings the case here on error.

*McComas & McKeighan,* for plaintiff in error:

The quarter-section in controversy is included in the lands ceded and sold to the United States by the treaty of January 21, 1867, made with the Osage Indians. (14 Stat. at Large, 687.) The Indians, in consideration of $300,000, sold these lands to the government, the lands to be surveyed and sold "under existing laws for cash; but no pre-emption or home-stead settlement shall be recognized." The laws of congress providing for purchase by pre-emption were passed respectively, 4th September, 1841, 5 Stat. at Large, 453; 27th March, 1854, 10 Stat. at Large, 269; 22d July, 1854, 10 Stat. at Large, 308–310; 3d March, 1853, 10 Stat. at Large, 244. The right of the plaintiff to purchase in the character of a *pre-emptor* depends upon the effect of the clause in the treaty prohibiting the recognition of pre-emption settlement.

We contend that this clause is invalid. The powers of contracting parties to a treaty must be either limited by the subject-matter thereof, or there is no limit. Then the limitation in this case must have been the thing concerning which the parties were treating, viz., the sale and purchase of the Indian title to this land, which was possessory merely. (7 Stat. at Large, 240.) Tested by this rule, the Indians had no power to regulate the disposal of the fee, which was in the United States to the same extent before as after the treaty. The sale of the public land by pre-emption was one of the "existing laws." The cases of *Holden v. Joy,* and *Parker v. Winsor,* are not in point, because, in the first case, the Chero-kee nation of Indians had the fee-simple title. In the latter case, the sale to the Atchison & Pike's Peak Railroad was made and sustained, because such a disposition would enhance the value of the remaining Indian lands, and was clearly within the doctrine of *Doe v. Wilson,* 23 Howard, 463. Such a provision as the one in question could not add to the consideration, nor can it be held to have been such a consider-

ation, but for which the treaty would not have been made.

The rejection by the local land office of plaintiff's offer to pre-empt and pay, did not affect the right of possession of the plaintiff. The steps taken by him had relation to the acquisition of the legal title. The mere rejection of proof and payment by the register and receiver might embarrass him in getting a perfect title, but could not take away either his right of possession, or his right to acquire title; and if the department has wrongfully issued a patent it would be in trust for the plaintiff. 23 Howard, 66; 13 Wallace, 72.

2. But although it should be held that such pre-emption prohibition in the treaty is valid and operative, yet the defendant, in order to defeat the plaintiff's action, must show a superior and paramount claim: *Eaton v. Giles*, 5 Kas., 24; *Brenner v. Bigelow*, 8 Kas., 496. The plaintiff being in the exclusive and peaceable possession, is entitled to have his possession protected as against all persons but the owners of the paramount right. (See *Rogan v. Walker*, 1 Wis., 527, 589.) And the defendant must show that he has acquired the paramount right from the government. The plaintiff's petition does not defeat itself by disclosing such superior right in the defendant; and at the time the demurrer was sustained the defendant had introduced no proof. The court will take judicial notice of the acts of congress pleaded by the defendant, but not of the compliance by defendant with its provisions, the withdrawal in its favor by the Secretary of the Interior, etc. These are matters of proof; the evidence might or might not have established it, admitting that the act of congress, set up in the answer, in fact includes the Osage ceded lands.

3. We contend that the act of congress of July 26, 1866, (14 Stat. at Large, 289,) set up by the defendant, does not embrace in its general granting-clause these lands. It is a familiar and long-established rule of construction of grants, that they are to be construed liberally in favor of the grantor and strictly against the grantee: 2 Blackst. Com., 347; 4 Mass., 139; 23 How., 66; 11 Peters, 420; 2 Black, 359.

In the interpretation of a grant it must be expounded according to its intent at the time of the grant: 4 Bac. Abr., 526. Nothing passes a perfect title to land except words of present grant: 13 Peters, 498. The words of this grant are words of present grant. The grant creates so much float over the land affected by it *at the time of the grant*, the *particular* sections only remaining to be designated by the location of the road : 9 Wallace, 95.

But in order that the float may be *over* the land it must be capable of being made certain at the time of the grant, so that if the road should be located on the day the grant was made, the particular sections might be designated and conveyed by patent to the railroad company. At the time of the passage of the act of congress, these lands were an Indian reservation, to which the Indian title had not been extinguished. The odd sections could not have been designated so long as the Indian ownership existed. The government then not having the perfect right and title to these lands did not grant them; and testing the act of congress by the foregoing rules, must be held not to have intended to grant these lands. The right of way was given over lands of this character, and the right of way only. (See proviso.) Although it should be held that these lands were included in the words of general grant, then we say that these lands, and all lands of a similar character, were excepted from the grant by the first proviso, which expressly reserves and excepts "from the operation" of the act "all lands heretofore reserved to the United States by any act of congress, or *in any other manner by competent authority.*" All lands reserved "in any manner" were excepted absolutely from the operation of the act. These lands were at that time the lands of the Osages, reserved by "competent authority."

The amendment to the treaty, "including any act granting lands to the state of Kansas, in aid of a railroad through said land," cannot enlarge the act of congress. It does not even assume to. It simply recognizes any act granting lands in aid of a railroad through said land. It still must first be

determined whether there is *such* an act; and if it is decided that the act of July 26, 1866, did not embrace these lands, why then the amendment included nothing. This amendment does not grant anything; it merely relates to the mode of disposing of what had been sold to the United States by the ceding clause of the treaty. The treaty of January 21, 1867, is often referred to as the treaty of 1865, probably from the fact that the original articles were drawn up in that year. The treaty itself, however, provides that it shall not go into effect until "ratified by the Senate, and approved by the President," which did not take place until 21st of January, 1867. But even if this provision had not been in, we still hold that the treaty, in respect to private rights, would not have gone into effect until proclaimed. 9 Wallace, 32.

The whole object and scope of the treaty is against construing the act of July 26th to operate upon these lands. The treaty provides that after reimbursing the government, the "remaining proceeds of the sales shall be placed in the treasury of the United States to the credit of the civilization fund, to be used under the direction of the Secretary of the Interior for the education and civilization of Indian tribes residing in the United States." It is a general principle applicable to public lands, that whenever any tract shall have been set apart for any purpose whatever, from that moment it becomes severed from the mass of public land, and no law would be construed to embrace it. (13 Peters, 499.) These lands were set apart to be sold for two purposes: one to reimburse the United States, the other to provide a fund to educate the Indians. It is hard to see how either of these objects can be accomplished by giving them to railroad companies. Congress, by joint resolution, April 10, 1869, (16 Stat. at Large, 55,) provided for a mode of sale of these lands not existing at the time of the execution of the treaty, and without recognizing that the railroad companies had any claims to these lands. And again, by act of July 15, 1870, (16 Stat. at Large, 362,) provided for a sale of another portion of the Osage lands in a manner inconsistent with the claims of rail-

road companies.   The judiciary should give a severe and strict construction to grants of public lands.   The courts may not repeal acts of congress, but they may and ought to refuse to allow what congress has not manifested a clear and unambiguous intention to bestow.

Hon. *Wm. Lawrence,* of Ohio, also for plaintiff in error:

In this case I submit to the court my three arguments as follows: 1st, Argument of December, 1871, before the Secretary of the Interior; 2d, Reply to the argument of Judge B. R. Curtis, December, 1871; 3d, Reply February 5th, 1872, to the opinion of the Assistant Attorney General, delivered January 25, 1872.*   And I propose to add a few additional remarks.

1. The *technical questions* presented as to the jurisdiction of the court, etc., are made in direct violation of the "assurance," read by Judge B. R. Curtis to the Secretary of the Interior in his argument December, 1871.   But without reference to that, the case of *Eaton v. Giles,* 5 Kas., 24, decides that the court can and should decide the merits of the case. And this court has decided a similar question in a later case, (8 Kas., 496.)

2. It has been supposed the recent decision of the supreme court of the United States in *Joy v. Holden* has something to do with this case, but it has not.   The assistant attorney-general in his opinion of January 25, 1872, very properly decided that the Osage treaty of 1865 "*did not create the grant*" to any railroad company.   The case of *Joy v. Holden* does *not* decide that an Indian treaty unaided by act of congress can dispose of public lands.   On the contrary in that case it is said, "It is not necessary to decide the question." I know it is said in that case, "There are many authorities where it is held that a treaty may convey to a grantee a good title," etc.   But I deny that one such authority can be pro-

[* THESE three arguments of Judge Lawrence have also come to the hands of the reporter. If printed entire, here, they would occupy 200 pages at least of this volume. Not desiring to make a synopsis of the arguments, they are omitted.—REPORTER.]

22—11 KAS.

duced except in case of a treaty *authorized or ratified* by act of congress. But that question does not arise in this case.

3. In my several arguments I think I have sufficiently shown that the Osage ceded lands were excepted from the grant made by the acts of congress, of March 3, 1863, and July 26, 1866. I will add but little in addition to what is there stated: The pre-emption act of Sept. 4, 1841, excepts "lands included in" any *reservation* by any treaty, law, etc. Now, it was never supposed that the extinguishment of an Indian treaty reservation subsequently to this act opened the lands to pre-emption. The reason that lands included in such *reservations* at the date of the pre-emption act, did not become subject to its operation by the subsequent extinguishment of the reservation was, that the pre-emption act *excepted* from its operation all reservations, and this meant all lands *covered by reservations* at its *date*, no matter what their status might subsequently become. It was because of this that the acts of congress of July 22, 1854, and June 2, 1862, *expressly* opened up *all* lands to pre-emption " to which the Indian title has been [since the pre-emption act of Sept. 1841,] or shall be extinguished." Now the *exception* in the railroad land-grant acts of 1863 and 1866 should, like the pre-emption act of 1841, apply to all Indian reservations existing *at the date of those acts*, and this excepts the Osage lands from any grant. These acts like others, should operate on persons and things as they existed at their respective dates. This is so unless grants for railroad companies are construed differently from all others.

The pre-emption act of September 4, 1841, excepts from its operation substantially the same classes of lands that are excepted in the acts of 1863 and 1866, and prior and subsequent railroad-grant acts. In fact, the exceptions in nearly all the railroad-grant acts seem to have been copied from the pre-emption act. They should therefore have the same construction put on them — that is, the exceptions should operate at the date of the acts. This is especially so when we remember the rule of strict construction against railroad land-grants,

and the rule of liberal construction in favor of pre-emptions, and which should give to the acts of 1854 and 1862 the most enlarged operation practicable.

So completely has this been the general understanding, that where it has been intended that the exceptions from the grant made for any railroad should depend upon the *status* of the lands "at the time the line of road is definitely fixed," it has been so clearly expressed, as in the act of July 2, 1864, (13 U. S. Stat. 364, § 19,) granting lands to the Burlington & Missouri River Railroad Co. This act differs in its phraseology from the acts of 1863 and 1866 and from many others. The change in phraseology was evidently made because, without it, Indian reservations existing at the date of an act like that of 1863 and 1866, would be excepted from the grant. This change of phraseology is an important and significant consideration. There is not only a difference in the phraseology of the language of the grant affecting the time it becomes operative, but in the act of July 2, 1864, *there is no proviso* excepting from the grant, *Indian reservations* existing at the date of the act, as there is in the acts of 1863 and 1866 now in controversy. This shows very conclusively that the *proviso* was understood to be operative at the date of the acts so as to except all reservations from grant, and hence the Burlington and Missouri River grant was made in different terms, and entirely omits the proviso. In fact, unless the effect is given to the proviso now insisted on, it can have no operative effect at all. (See *Wolcott v. Des Moines Co.*, 5 Wall., 681; *R. R. Co. v. Fremont Co.*, 9 Wall., 94; *Lessieur v. Price*, 12 How., 59.)

Under this act of July 2, 1864, it was decided by the Secretary of the Interior in the matter of Samuel M. Boyd v. The Burlington and Missouri River Rld. Co., April 28, 1871, that where there was a "subsisting homestead" on a quarter-section of land within the railroad limits "when the right of the railroad company attached, that on the subsequent abandonment of the homestead, the land reverted to the government and not to the company." This in principle shows

also that the extinguishment of an Indian reservation gives the government new rights to the land covered by it, but gives nothing to any railroad company. In my argument of December, 1871, in referring to the Osage Indian *reservation* and the *proviso* of the act of March 3, 1863, I said: "There was no reservation but this (Osage) to which they (the words of the proviso) could apply in Kansas." And I argued that as the proviso declared, "that all lands heretofore reserved, in any manner, for any purpose, are reserved from the operation of this act," the Osage reservation was "reserved from the operation of the act," and intended to be because it was the only reservation to which the proviso could apply. This was made all the more certain because the proviso gave the right "to locate the routes of said road through such reserved lands." The proviso then was intended to except from the operation of the grant not merely reservations *at the "end"* of a road, but a reservation *"through"* which the road was expected to and must necessarily pass. And there was no reservation "through" which the road could pass but the Osage. It was therefore necessarily excepted from the grant. In the argument of Judge B. R. Curtis, in reply to mine of December, 1871, he conceded substantially all this, and sought to evade its force by saying:

"One of these roads—the one I am now considering—began at Leavenworth and ended at Fort Gibson, and the other one began at Fort Riley and went by the way of Fort Gibson to Fort Smith, in Arkansas—so that one of these roads has a military reservation *at each end*, and the other of them had a military reservation *at each end and in its middle;* and the five miles on each side granted by this act, *if it were not for this proviso* would have covered those military reservations. There was thus ample scope for this reservation to operate practically without resorting to the Osage lands to satisfy its terms."

I am grateful for this acknowledgment of Judge Curtis': "If it were not for this *proviso*" the grant "would have covered those military reservations." Precisely. And if the *proviso* excludes from the land-grant military reservations,

why not also Indian reservations? I might say with Judge Curtis, "if it were not for this proviso" the grant would have covered the Osage reservation, though in fact there are other provisions which exclude it. How can the court say one kind of reservation is excluded, and another not? Assistant attorney-general Smith concedes that the words of the proviso "are broad enough to include a reservation to Indians." It may be supposed, from what is said in my reply to the argument of Judge Curtis, that I was mistaken in the fact that there was no "reservation" but the Osage "through" which the two railroads would necessarily run. But a re-examination shows my original statement is correct. There were at one time Indian reserves along what is now the line of one or the other of these two railroads, the "Osage," the "Ottawa," "New York Indian," and "Kaw, or Kansas diminished and trust." But the Osage was the only one remaining when the acts of 1863 and 1866 were passed. All others had ceased to be *reserves*. In proof of this, I introduce here copy of letter from commissioner of general land office, to myself, as follows:

WASHINGTON, D. C., APRIL 9, 1872.

SIR: In reply to the inquiries contained in your communication of this date, you are respectfully advised that the following Indian reservations in the state of Kansas were set apart and authorized to be sold under the authority hereinafter indicated in each case, viz.:

*Ottawa Reserve.*—Set apart by 3d article Treaty of Aug. 30, 1831. (7 Stat. at Large, 360.) Authorized to be sold by 9th article Treaty of June 24, 1862. (12 Stat. at Large, 1240.) These lands were sold between the years 1863 and 1868.

*New York Indian Reserve.*—Set apart by 2d article Treaty of January 15, 1838. (7 Stat. at Large, 551.) Reverted to the public domain, not having been occupied by these Indians.

*Kansas or Kaw Reserve.*—Set apart by 2d article Treaty of June 3, 1825. (7 Stat. at Large, 244.) Part of Reserve ceded to the United States by 1st article Treaty of January 14, 1846. (9 Stat. at Large, 842.) Authorized to be sold by 4th article of Treaty of October 5, 1859. (12 Stat. at Large,

Wood v. M. K. & T. Rly. Co.

1111.) These lands have not yet been disposed of. For explanation as to the Diminished Reserve and Trust Lands of these Indians, see 1st, 2d, 3d and 4th articles of the Treaty last above referred to.          Very respectfully,

F. A. WALKER, *Commissioner*.

This letter shows, and an examination of the treaties and laws will show, that the "Ottawa," and "Kansas," and New York Indian Reserves *did not exist* at the dates respectively of the land-grant acts of 1863 and 1866. Judge Curtis, as will be seen in his argument, did not so claim them. Yet the assistant attorney-general in his opinion of January 25, 1872, p. 12, says:

"The first [the road of the L. L. & G. Rld. Co.] passed through the reservation for the Ottawas, as well as the Osages, and the second [the road of the M. K. & T. Rly. Co.] the reservation for the Kansas Indians, as well as the Osages. There was, therefore, ample scope for the *proviso* to act upon, without including the Osage lands, and counsel for the settlers was mistaken when he said that the Osage reservation was the only one that the proviso could operate upon."

Much of this opinion is a mere copy, in substance, of Judge Curtis' argument. But on this branch of the subject, the opinion ventured to add a little to Judge Curtis' argument, and in doing so fell into an error of fact which Judge Curtis did not make. And this error may account for the erroneous conclusion at which the opinion arrived.*

[* To a proper understanding of the argument of Judge LAWRENCE, it is necessary to state that the opinion which he is commenting upon is an official opinion given by Hon. W. H. SMITH, assistant attorney-general of the United States, January 25th 1872, in relation to the Osage Ceded Lands in Kansas. The case in which such opinion was given was before the Interior Department on appeal in a contest between certain settlers on a certain quarter-section of the Osage lands, and the L. L. & G. Railroad Co. The railroad company claimed said quarter-section under certain acts of Congress granting lands in aid of railroads. The settlers claimed under the homestead and pre-emption laws of the United States. Assistant attorney-general SMITH decided that the "Treaty between the United States and the Great and Little Osage Indians — concluded September 29, 1865 — ratification advised by the Senate, with amendments, June 26, 1866 — amendments accepted by the Osages September 21, 1866 — Treaty proclaimed January 21, 1867," (14 Stat. at Large, 687,) "operated as a *repeal* of the general homestead and pre-emption laws so far as the *Osage Lands* are concerned." He also held that Congress, by the acts of 1863 and 1866, (under which the M. K. & T. Railway Co., and the L. L. & G. Railroad Co. claim land-grants,) "*intended* to make a grant to each of said railroads *through* the Osage tracts." The Secretary of the Interior, Hon. C. DELANO, approved said opinion of assistant attorney-general Smith.—REPORTER.]

Now, the Ottawa and Kansas lands *were* either reserves, as the assistant attorney-general alleges, or they *were not*. If they were, and therefore, as the assistant attorney-general alleges, were "scope for the proviso to act upon," why is not the Osage reserve also "scope for the proviso to act upon?" If the proviso *excepted* from the railroad-grant the Ottawa lands and the Kansas lands, because they were Indian reserves—"scope for the proviso to act upon"—why does not the proviso *except also* from the railroad-grant the Osage reserve? And if, as the fact is, the Ottawa and Kansas Indian lands were not reserves, then there is no other reserve "*through*" which the road of the L. L. & G. Rld. Co. could run but the Osage ceded lands, and they are, therefore, expressly reserved from the grant. Either horn of the dilemma is fatal to the reasoning and conclusion of the assistant attorney-general.

In many of the railroad land-grant acts of congress, the same provisions are found as in the Kansas acts. There were Indian reservations along the lines of these grants. And I venture to assert that no court, department of the government, or officer, has ever held that a railroad-grant ever attached in any *Indian reservation*—that all usage has been against it—that the records of the land-office will so show, and that if so held now, it will be the first time under similar circumstances since the system of grants commenced. The assistant attorney-general, with ample means to know the fact, does not in his opinion controvert this. I am not aware that it has ever been controverted. I made application to the Interior Department in June, 1872, for information on this subject, and I asked to be informed if any *railroad company* had ever received lands under circumstances similar to those under which the railroad companies claim the Osage lands. The department refused to answer my inquiries! I assume, then, that no such claim for any railroad company was ever before made, or if so, never was allowed by the Interior Department except in the case of the Osage lands.

The claim now made by these railroad companies is an

*afterthought*—never dreamed of when the acts of 1863 and 1866 were passed. I have, in my other arguments, referred to the emphatic and repeated denial of these claims by Comsioner Wilson, of the general land office; to the opinion of Secretary Cox against them; to the fact that no two men have ever been agreed upon any ground to support them. I have shown that Assistant Attorney-General Smith, in his opinion of January 25, 1872, on which the very patent now in controversy was issued, says of the Osage treaty of 1865, "the treaty was not intended to create, and in my opinion did not create the grant to the road." I believe no one doubts but that an act of congress may repeal a treaty. Yet, notwithstanding all this, Assistant Attorney-General Smith decides that the treaty *repeals* the homestead and pre-emption laws so far as the Osage lands are concerned—that the settlers on Osage lands claimed by the railroad companies have no rights thereto, but that said lands were granted by congress to said companies. This opinion of the assistant attorney-general is so flatly absurd, so contrary to all the former practice of the government, and not only unsupported by, but directly opposed to, all authority, that the commissioner of the general land office, referring to Indian lands, the *status* of which I have already shown by his letter of April 9, 1872, above quoted, said in an official letter, March 16, 1872, "The Ottawa, Kansas diminished, and Kansas trust lands, being reserved at the date of the right of the roads attaching under their grants to be disposed of in a special manner, as designated in the treaties relative thereto, are excepted from the provisions of the railroad grants, there being nothing in the treaties with those Indians recognizing railroad rights." In his opinion the lands reserved for any purpose are not subject to the acts of 1863 and 1866. These acts make no grants in reservations.

*T. C. Sears*, for defendant in error:

1. The consideration of this case involves but two inquiries: 1st.—Conceding to the plaintiff all the qualifications of a pre-

emptor, that he complied with all the provisions of the federal law concerning pre-emption, and that the land in controversy was subject to homestead and pre-emption entry, has he such an interest in the land that he can call upon the defendant to show or assert its title? 2d.–Is, or was, the land described in plaintiff's petition subject to the homestead and pre-emption laws of the United States?

To the first inquiry I assert that the plaintiff has shown a state of facts that repels.conclusively the presumption of such a possession contemplated by law, or recognized by any statute, that "he may demand an investigation and determination of the validity" of an "adverse claim." The action is confessedly brought under § 594 of the civil code. It will not be contended that every possession will authorize the maintaining of this· kind of action. If the petition of plaintiff in any given case should show upon its face that he had with force and arms broken into an inclosure not his own, and taken possession without claim or color of title, legal or equitable, it would not·be claimed that *such* a possession would support an action under this section. If the petition should assert that he had taken possession, with the intention to purchase, but the true owner refused to sell, then he evidently could not maintain the action. The possession must be a *legal* one, and, in case of claim of ownership, under a title legal or equitable. The petition here shows a mere naked possession, the title to the land remaining in the United States, which refuses to recognize any claim whatever of the plaintiff to the fee or a right of possession. The United States have established tribunals before which persons intending to make claims to the public lands may appear. If counter claims are made, jurisdiction is conferred upon those tribunals to hear and decide any contest that may arise under them. When those tribunals *have acted*, and the government has conveyed its interest to one of the contending parties, then it would seem that the courts may take jurisdiction; and if the land tribunals have conveyed to the wrong party, they will declare the land held in trust for the rightful owner.

This I understand to be the extent, and no further, of the rule laid down in *Johnson v. Towsley*, 13 Wallace, 72. But until the general government has taken jurisdiction, decided and transferred its title, the courts, whether state or federal, have no jurisdiction whatever. There is absolutely nothing upon which the latter could base a judgment. The substance and plain English of the allegations in the petition are: that the land belongs to the United States; that they refuse to convey to plaintiff; that the defendant "sets up and claims an estate and interest in and to said tract of land." And although he asserts such "claim, estate and interest" are "fraudulent and groundless," there is no pretense in the petition that defendant's "claim, estate and interest" have ever been recognized by the real owner, or passed upon by any of its tribunals. The plaintiff shows that the real owner refuses to sell to him; alleges that defendant's claim is "fraudulent and groundless;" and yet, without the owner being in court, asks that the rights of the parties may be determined! The allegations of plaintiff's petition do not bring him within the principles decided by this court in *Eaton v. Giles*, 5 Kas., 24. The plaintiff shows mere naked possession. He does not allege any "unlawful intrusion" on the part of the defendant, nor any interference whatever with his possession. He does not allege, in words or in substance, that the defendant sets up an "adverse claim" that renders "his property less valuable," or his "enjoyment of it less complete and satisfactory than *his right*." It seems to me, therefore, entirely clear that —admitting all the plaintiff claims—he has not such an interest in the land described in the petition, that he can call upon the defendant to show or assert its title.

2. Was the land described in plaintiff's petition subject to the pre-emption and homestead laws of the United States? The land in question was formerly a portion of the lands reserved to the tribe of the Great and Little Osage Indians by the government of the United States. On the 29th of September 1865 a treaty was concluded between the United States and the said tribe of Indians. On the 26th of June

1866 a ratification of the treaty was advised, with sundry amendments, which were agreed to and accepted. And on the 21st of January 1867 the treaty was proclaimed by the President of the United States. (14 Stat. at Large, 687.) The material portions of the treaty bearing upon questions involved in this case are contained in the first article, and are as follows:

"ARTICLE I. The tribe of the Great and Little Osage Indians having now more lands than are necessary for their occupation, * * * do hereby *grant* and *sell* to the United States the lands contained within the following boundaries, that is to say: * * * Said lands shall be surveyed and sold, under the direction of the Secretary of the Interior, on the most advantageous terms, *for cash,* as public lands are surveyed and sold under existing laws, including any act granting lands to the state of Kansas in aid of a railroad through said lands; but no *pre-emption claim or homestead settlement shall be recognized.*"

The treaty, by the terms of which these lands were originally reserved to the tribe of Great and Little Osage Indians, was made June 2d, 1825. (7 Stat. at Large, 240.) The title that the Indians have, is well settled by a long line of decisions in our courts, as well as by frequent and undisputed legislative recognition. Their right is that of occupancy alone. The fee is in the United States. So long as, and wherever their right obtains, the lands so reserved are prohibited from occupation or entry by citizens of the United States for the purposes of settlement; and the right cannot legally be taken from them except by their consent. That consent, from the earliest negotiations with them by the government, has been obtained through treaties. If they may contract by treaty for an *unqualified sale* of their *entire* estate, may they not dispose of a lesser interest, or attach specific conditions to the sale? If by the terms of the treaty an unconditional transfer had been made, for a certain specific sum named, to the United States, unqualified as to terms of sale or disposition, then it is conceded that in the absence of the intervention of any prior vested interest, the lands would become public

lands, subject to homestead and pre-emption entry. For it is too late to dispute the fact that lands can be acquired by a treaty with Indians. The practice of the government has been too long settled to be questioned now.

But this treaty expressly provides that these lands shall be surveyed and sold for cash, "but no pre-emption claim or homestead settlement shall be recognized." There can be no doubt as to the *intent* of the contracting parties. They *intended* that the operations of the acts of congress as to homestead and pre-emption entry and settlement, should not extend to the lands so conveyed. Two questions are presented: Was this provision of the treaty legal and valid, at the time it became operative? If it was, has it been rendered invalid by any subsequent legislation? The first inquiry involves an examination of the legal effect of Indian treaties, and the comparative effect of such treaties and acts of congress; and we refer to Const. of U. S., art. 6, § 1; *Turner v. Am. Bap. Mis. Society,* 5 McLean, 349; *U. S. v. Brooks,* 10 How., 460; *Fellows v. Blacksmith,* 19 How., 372. In the case of *Joy v. Holden,* 2 Dil. Ct. Ct. Rep., in the circuit court of the U. S. for the District of Kansas, Mr. Justice Miller, among other things held—1st, That the treaty of 1835 gave a fee simple title, to the Cherokee Indians, of the Neutral Lands; 2d, That whether the Indians hold the fee, or only the *ordinary possessory right, the treaty of* 1866–1868 *gave a full title to the purchaser* under the provisions; *as such was plainly the intent* of the treaty-making power. These findings of law were subsequently affirmed by the Supreme Court of the United States. *Joy v. Holden,* 17 Wallace, 211.

It being thus established that our Indian treaties are entitled to as much consideration as a treaty with an independent foreign power, what effect shall be given to them when, by their provisions, they suspend or supersede acts of congress? So long as these Osage lands remained a reservation under the treaty of 1825, they were as absolutely and completely without and beyond the operation of the pre-emption laws as if they were beyond the territorial limits of the United

States; and they could not be brought within their operation, as before stated, without the consent of the Indians; and that consent could be indicated only by the exercise of the treaty-making power. The Indians' right, estate and interest were absolute, vested, and, unless they assented otherwise, existed in perpetuity. Suppose that a treaty had been made with the Mexican Republic for the transfer to the United States of some Mexican province: would it not have been entirely competent for the contracting parties to have incorporated as one of the conditions of that transfer, that any particular act of the congress of the United States should not become operative within the boundaries of that province? It cannot be denied. The parties would not only have jurisdiction of the subject-matter, but *exclusive* jurisdiction thereof. Here, too, the contracting parties have *exclusive* jurisdiction of the subject-matter. The treaty-making power is derived, not from any acts of congress, but from the *constitution* itself. Its jurisdiction *conceded* over the subject-matter, all other authorities must yield to it; *because* all its acts, within its jurisdiction, are the "supreme law of the land." But this question of conflict between the legislative and treaty-making power of our government, has been thoroughly considered by the executive department, and perhaps the judicial, and has always received an uniform solution. See 3 Attorneys-General Opinions, 56; 6 id., 291, 658; 9 id., 25; 10 id., 508; 11 id., 145; 1 Cranch, 109; 2 Peters, 314; 2 Curtis, 454; 1 Walworth, 155.

The courts and the government have applied the same doctrine and rule to Indian treaties as to those made with foreign powers. Some of the authorities have declared that an act of congress was repealed by necessary implication, (6 Opinions, 658,) when its enforcement necessarily contravened the spirit and effect to be given to the treaty. Can it be doubted, then, for a moment, that when an express stipulation is incorporated as a condition and covenant in the contract, concerning a subject-matter over which the high contracting powers had exclusive jurisdiction, that this stipu-

lation shall be observed and faithfully executed, although *pro tanto* it may operate as a repeal of a prior act of congress? It seems to me conclusive, both upon reason and authority, that the provision in the Osage Treaty prohibiting homestead and pre-emption rights in the ceded lands, operated as a repeal of the general homestead and pre-emption laws, so far as these lands are concerned. It follows then, if the foregoing conclusions are correct, that plaintiff's possession is not only a *naked* one, but *illegal*. He claims that he went there as a *pre-emptor*. The lands were *forbidden* to pre-emption, and he knew it. He could with just as much legal reason and propriety enter upon the lands of any private citizen in Kansas, and claim the *right* to pre-empt them, as lands to which the "supreme law of the land" has prohibited the right of pre-emption entry. He was and is a *trespasser*, and has no right of possession, claim, interest or estate.

The second point is quickly disposed of: Has the prohibitory clause in the treaty been removed by subsequent legislation? The only acts of congress that can possibly bear upon this question are the joint-resolution of April 10th, 1869, (16 Stat. at Large, 55,) and 12th section of the act of July 15th 1870, (16 Stat. at Large, 362.) Said joint-resolution provided—

"That any *bona fide* settler residing upon any portion of the lands sold to the United States, by virtue of the first and second articles of the Treaty concluded between the United States and the Great and Little Osage tribe of Indians, September 29th, 1865, and proclaimed January 21st, 1867, who is a citizen of the United States, or shall have declared his intention to become a citizen of the United States, shall be, and hereby is, entitled to purchase the same in quantity not exceeding 160 acres, at the price of $1.25 per acre, *within two years from the passage of this act,* under such rules and regulations as may be prescribed by the Secretary of the Interior: *Provided, however,* That both the odd and even-numbered sections of said lands shall be subject to settlement and sale as above provided: *And provided further,* That the sixteenth and thirty-sixth sections in each township of said lands shall be reserved for state schools, in accordance with the provisions

of the act of admission of the state of Kansas: *Provided, however,* That nothing in this act shall be construed in any manner affecting *any legal rights heretofore vested in any other party or parties.*"

If this resolution really cut any figure in this case, it would be interesting to analyze it; and we might perhaps find how aptly even *congressional legislation* may sometimes be employed to serve political uses, by feeding hopes and raising expectations that are as illusory, deceptive, and unreal as the demagogical spirit that prompts them.   Now, if the *right of pre-emption* existed *before* the passage of this resolution, (whose only merit is in the last proviso,) it is difficult to perceive its necessity.   It is enough to say, as applicable to the case at bar, that the plaintiff did not avail himself of its provisions.   The time within which these rights were to be exercised, expired within two years from its passage, viz., April 10th, 1871.   Plaintiff made his settlement July 22d, 1871.   Hence he can claim nothing under it.

The 12th section of the act of July 12th, 1870, provided for the removal of the Osages from Kansas, and made an appropriation for that purpose, directing that the government should be reimbursed "from the proceeds of the sale of the *lands of the said Indians in Kansas, including the Trust Lands north of their present diminished reservation,* which lands shall be open to settlement after survey," etc.   These were lands lying west of what is known as the "Ceded Lands" which had been conveyed (ceded) to the government by the Treaty of 1865–1867, and in which latter are included the lands described in the plaintiff's petition.   Certainly this works no *repeal* of the prohibitory clause in the treaty, and said clause stands and remains applicable to the plaintiff, and all others similarly situated.

Counsel for the plaintiff have seen fit to argue to some extent the "claim and estate" of the *defendant* in and to the "Osage Ceded Lands."   How this can be brought before this court in the present status of the case, it is difficult to understand.   The court below decided nothing except that the

plaintiff, upon his own petition, had no standing in court.

The opinion of the court was delivered by

VALENTINE, J.: The petition below shows that the plaintiff James Wood resides upon and occupies a certain quarter-section of land included in the tract ceded by the Osage Indians to the United States by virtue of the treaty of September 29th 1865. (14 Stat. at Large, 687.) Said petition also shows that said plaintiff "settled" upon said land on the 22d of July 1871; that afterward he attempted to pre-empt the land; that the government land officers refused to permit him to do so; that the defendant, the Missouri, Kansas and Texas Railway Company, claims to have some estate or interest in said land; but that the title to the same still remains in the government of the United States; and the plaintiff asks to have his said possession and occupancy quieted as against said defendant. When the action came on for trial in the court below the plaintiff offered to introduce in evidence an agreed statement of the facts of the case. The defendant objected thereto on the ground that the petition did not state facts sufficient to constitute a cause of action, and also objected on the ground that the court did not have any jurisdiction of the subject-matter of the action. The court below sustained the objection on the first ground, and the plaintiff excepted. Said agreed statement of facts contained substantially the same facts as were alleged in the said petition. Did the petition or the agreed statement of facts state a cause of action? Neither did, as we think. It all depends however, in our judgment, upon the validity of that clause of said treaty which provides that "no pre-emption claim or settlement shall be recognized," as attaching to or affecting said Osage Ceded Lands. The first article of said treaty reads as follows:

*Statement of case.*

*Osage Treaty of 1865–1867.*

"ARTICLE 1. The tribe of the Great and Little Osage Indians, having now more lands than are necessary for their occupation, and all payments from the government to them under former treaties having ceased, leaving them greatly impoverished, and

being desirous of improving their condition by disposing of their surplus lands, do hereby grant and sell to the United States the lands contained within the following boundaries, that is to say: beginning at the southeast corner of their present reservation, and running thence north with the eastern boundary thereof fifty miles, to the northeast corner; thence west with the northern line, thirty miles; thence south, fifty miles, to the southern boundary of said reservation; and thence east with said southern boundary, to the place of beginning: *Provided,* That the western boundary of said land herein ceded shall not extend farther westward than upon a line commencing at a point on the southern boundary of said Osage country one mile east of the place where the Verdigris river crosses the southern boundary of the state of Kansas. And in consideration of the grant and sale to them of the above described lands, the United States agree to pay the sum of three hundred thousand dollars, which sum shall be placed to the credit of said tribe of Indians, in the treasury of the United States, and interest thereon at the rate of five per centum per annum shall be paid to said tribes semi-annually, in money, clothing, provisions, or such articles of utility as the Secretary of the Interior may from time to time direct. Said lands shall be surveyed and sold, under the direction of the Secretary of the Interior, on the most advantageous terms, for cash, as public lands are surveyed and sold under existing laws, [including any act granting lands to the state of Kansas in aid of the construction of a railroad through said lands;] *but no pre-emption claim or homestead settlement shall be recognized;* and after reimbursing the United States, the cost of said survey and sale, and the said sum of three hundred thousand dollars placed to the credit of said Indians, *the remaining proceeds of sales shall be placed in the treasury of the United States to the credit of the* 'civilization fund,' to be used, under the direction of the Secretary of the Interior, for the education and civilization of Indian tribes residing within the limits of the United States." (14 U. S. Stat. at Large, 687, 692, article 1, and amendments.)

Whether the president and senate of the United States have the power by treaty to dispose of Indian lands we shall not discuss, as we do not consider the question as still an open one. (*Parker v. Winsor,* 5 Kas., 367, 368; *Joy v. Holden,* 14 Wallace, 211, and cases there cited.) That they have such power, and the power to

1. Indian treaties. Power of president and senate.

23—11 KAS.

prescribe the manner in which the terms and conditions upon which Indian lands may be sold or conveyed, seems to have been settled by all the departments of the federal government. (See the numerous treaties where such power has been exercised; the numerous acts of congress where such power has been recognized by appropriations, and other legislation carrying into effect the provisions of such treaties and recognizing their validity; and the cases above cited, particularly *United States v. Brooks*, 10 Howard, 442, 460.) If this were still an open question we should probably be inclined to question the power of the president and senate in such cases. But that question is foreclosed. And we proceed to the consideration of this case as though the president and senate, by treaty with the Indians, have full, ample and undoubted power to dispose of all the Indian lands, and to do so in the manner and upon such terms and conditions as they may in their judgment think best and proper. It will generally be conceded that the Indians have power by treaty to sell to the United States (in contradistinction to individuals,) all their lands absolutely, unconditionally, and every right and interest therein. Now, if the Indians possess this power, what is there to prevent them from disposing of less than the whole of their interest in their lands, or from attaching conditions to the sale of it? It would seem to follow as a necessary consequence that if they could sell all they possessed, they could sell less than all; if they could sell the whole of their interest, they could sell a portion of the same; if they could sell absolutely, they could sell conditionally. And if such does follow, then the sale to the United States, with the conditions attached, that their lands must be sold to individuals "*on the most advantageous terms for cash,*" and that "*no pre-emption claim or homestead settlement shall be recognized,*" is valid in every respect. There were doubtless sufficient reasons for inserting these conditions in the treaty; but whether there were or not we suppose we are hardly at liberty to question. The reasons for these conditions would seem to be that the

*Power of Indian tribes, in disposing of lands.*

*2. Osage Lands not subject to pre-emption.*

Indians desired to make the "civilization fund" "for the education and civilization" of themselves and other members of their race as large as possible. They unquestionably had a right to create such a fund, and the object was undoubtedly a noble one. But if they had allowed this land to be opened for pre-emption claims and homestead settlements, (as the plaintiff claims they did,) probably not a dollar would ever have been raised from these lands for said fund. It is even probable that there would not have been enough money realized from the sales of said lands to reimburse the United States. But with these conditions the fund will probably be large. Taking this view of the case, the plaintiff cannot pre-empt said land, for such pre-emption is prohibited by the treaty. His possession and occupancy is therefore merely a trespass upon government land. Of course, it will not be claimed that the plaintiff has any right to said land under the joint resolution of congress of April 10, 1869, (16 Stat. at Large, 55,) for the right to settle upon the Osage Ceded Lands, of which this was a part, expired April 10th, 1871, and the plaintiff did not go upon this land until July 22d, 1871. Neither will it be claimed that the plaintiff has any right to said land under § 12 of the act of congress of July 15th, 1870, (16 U. S. Stat. at Large, 362,) for that section can apply only to the Osage Diminished Reservation and the Osage Trust Lands, and cannot by any possible construction be made to apply to the Osage Ceded Lands. And there is no other act of congress or treaty, that has taken effect since the treaty of September 29th 1865 was made, which would give the plaintiff any right to said land. He is therefore, as we have before said, merely a trespasser upon government land. Can such a person maintain an action to

3. Action by trespasser, to quiet title. quiet his possession against some person who has no interest in the land, but claims that he has? We think not. It is claimed however by the plaintiff that he can, and the cases of *Eaton v. Giles*, 5 Kas.; 24, and *Brenner v. Bigelow*, 8 Kas., 496, are cited as authority therefor. But neither of these cases is in point. In both cases the

property in question had passed from the United States to an individual, and in both cases the court had a right to award title and possession to some individual, for it is certain that some individual owned the property, and had the right of possession thereto; and in neither case was the plaintiff a trespasser on any lands. Not so in the present case. In the present case the court has no power to give any right to the property or the possession thereof to any individual upon the face of the earth. The question involved in this case was not decided in either of those cases, and it could not have been so decided, (whatever may have been said in the opinion,) for it was not involved in either of said cases. In the case of *Eaton v. Giles* the action was decided *against* the plaintiff, (not *for* him,) on the ground that he had no sufficient possession of the property or interest therein to maintain the action. In the case of *Brenner v. Bigelow* the plaintiff not only held the actual possession of the property, but also held the legal title thereto, and claimed to hold the equitable title and the right of possession as against all the world. He was no mere trespasser, nor any trespasser, as the plaintiff in the present case is. In the case of *Eaton v. Giles* the court say in the opinion that "It is not every person who may bring a party into court for the purpose of determining the validity of his title. The plaintiff must show some right in himself, and some injury to that right by another, before he can subject him to the costs and vexations of a law suit." (5 Kas., 27.) And this is good law, and applicable to this case. It has never yet been decided by this court that a mere trespasser without color of right or title can maintain an action to quiet title or possession. Possibly however such a person may in some cases maintain such an action. A mere trespasser without color of right or title, who has been in the actual possession of real estate for fifteen years, claiming title thereto, becomes the owner of the property by virtue of the statute of limitations, if the property has been owned during all that time by some individual or individuals, and not by the United States. (Gen. Stat., 633, code, §16, subdiv. 4.) Mere pos-

session therefore of lands to which the government has parted with its title, for any period, however short, with a claim of ownership, may be said to be an incipient or inchoate title, for such a possession will in time ripen into a complete, perfect and absolute title. And it may be that a person with such a possession may maintain an action to quiet his possession, or for injuries thereto against any person who has not a paramount right, and who may claim adversely to him, or who may disturb his possession. But this can never be so where the government owns the real estate in controversy. The statute of limitation never runs against the government. (*Lindsey v. Miller*, 6 Peters, 666; *Gibson v. Chouteau*, 13 Wall., 92, 99.) Therefore no trespasser can ever obtain any rights upon government land. And no decision of any state court under the laws of the state can ever possibly give him any such rights. He may occupy the land a hundred years, and have a hundred decisions in his favor, and still the right of the government will be as absolute as ever. He may quiet his title and possession against every person in the known world, and still he has obtained nothing. The government may still sell to any one of these persons as freely as to him, and any one of them has the same right to purchase from the government that he has. And no length of time in which he may be in possession of the land will shorten the time in which the government has the right to assert its title or claims thereto, or in which it may sell to others, or in which these others may purchase from the government. A decision therefore quieting title to government land, being absolutely nugatory, it can hardly be supposed that our law-makers ever intended that such a decision should ever be made. But even if they should so intend, and pass a statute accordingly, the statute would be void. It is not necessary to examine to see whether the defendants own the land in controversy or not. If they own it, of course they should recover. If they should have even a mere license from the government to go upon the land, their right thereto would be paramount to that of the plaintiff's rights, and they should recover. But if the gov-

ernment owns the land, as the plaintiff's petition shows that it does, then the plaintiff has no sufficient interest in the subject-matter of the controversy to maintain this action. If the defendant is setting up an illegal claim to government land, it is for the government to object. The government ought to be able through its proper officers to protect its own rights and interests.

In the investigation of the question whether the Osage Ceded Lands are subject to pre-emption claims, we have not only had the benefit of the able arguments of counsel in this particular case, but we have also had the pleasure of examining the able arguments of Hon. S. O. Thacher, Hon. B. R. Curtis, and Hon. Wm. Lawrence, the opinion of the assistant attorney-general of the United States, Hon. W. H. Smith, and the decision of the Secretary of the Interior, Hon. Columbus Delano, upon the same question. Said arguments were made before the assistant attorney-general and the Secretary of the Interior; and it is the opinion of the assistant attorney-general, and the decision of the Secretary of the Interior, made after due consideration, that said Osage Ceded Lands are not subject to pre-emption claims.

The judgment of the court below is affirmed.

All the Justices concurring.