# HEATH *v.* WALLACE.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 528. Submitted January 9, 1891. — Decided March 2, 1891.

The question whether or not lands returned as " subject to periodical overflow " are " swamp and overflowed lands " is a question of fact, properly determinable by the Land Department, whose decisions, on matters of fact, within its jurisdiction, are, in the absence of fraud or imposition, conclusive and binding on the courts of the country, and not subject to review here.

Whether or not a survey made by an officer of the State of California is a " segregation survey " as defined by the act of the legislature of that State, approved May 13, 1861, is question on which this court will follow the decision of the highest court of that State.

THE federal question is stated in the opinion of the court.

*Mr. A. T. Britton* and *Mr. A. B. Browne* for plaintiff in error.

*Mr. James K. Reddington* and *Mr William J. Johnston* for defendant in error.

MR. JUSTICE LAMAR delivered the opinion of the court.

This was an action of ejectment in one of the state courts of California, to recover the possession of a tract of one hundred and sixty acres of land in San Joaquin County in that State, particularly described as the northwest quarter of section 23, township 3 north, range 7 east, Mount Diablo base and meridian.

The plaintiff below, who is also the plaintiff in error, set up a title derived from the State, claiming that the land was a part of its swamp land grant, under the act of September 28, 1850, as confirmed by the act of July 23, 1866. The defendant filed a general denial, and claimed title in himself, under the preëmption laws of the United States; and in a supplemental answer alleged that, since the commencement of the action, to wit, on the 1st day of June, 1882, he had received a patent to the land from the United States.

A jury having been waived, the case was tried by the court, which made a special finding of facts, and rendered judgment in favor of the defendant. That judgment having been affirmed by the Supreme Court of the State, 71 California, 50, this writ of error was sued out.

The material facts of the case, as found by the trial court, are substantially as follows: The United States subdivisional survey of the township in which the land in dispute is situated was made by deputy United States surveyor John Wallace, in the year 1865, and the survey, with the field-notes and plat thereof, was duly approved and the approval certified by the United States surveyor general for California on the 23d of August of that year. The official plat of the survey was filed in the United States land office at Stockton (that being the land district in which the land was situated) on the 18th of October, 1865, and a certified copy of the field and descriptive notes of the survey was filed in that land office on or about June 17, 1881.

A considerable part of the plat, including section 23, was colored blue, to distinguish it from the other portions of it, and thereon was written "Land subject to periodical overflow." The field-notes of the survey state. that in running the east line of this section the surveyor crossed three sloughs having a westerly course, one 30, one 50, and the other 80 links wide; and that in running the west line two sloughs, each 50 links wide and having the same general course, were crossed. And the descriptive notes made mention that the section was first-rate, level land, subject in some places to "overflow from slough." These designations represented that the land colored

blue was subject to inundation by the overflow of the Calaveras River and its branches, and was thus rendered incapable of being cultivated for the raising of crops, except by means of banks and levees which had been erected to prevent the overflow of the water during the winter and spring months.

In April, 1865, H. T. Hartwell made an application, under the laws of California, to purchase the tract in dispute from the State, as swamp and overflowed enuring to it under the swamp land grant, and on the 28th of that month the county surveyor of San Joaquin County made a survey, and recorded a plat and field-notes thereof, in accordance with the law of the State and the instructions of the State surveyor general, which plat and field-notes showed the survey of the county surveyor to be in accordance with the United States survey of the township, and the land to be swamp and overflowed. This plat and the field-notes accompanying it were filed with the State surveyor general on the 22d day of October, 1865, and were duly approved by him on the 23d of November following.

It does not appear that any further action was taken on this application. In April, 1869, Hartwell made another application to purchase the tract from the State, under the act of the California legislature, approved March 28, 1868. A survey thereof was accordingly made by the county surveyor, which made the same showing as the former one, and, together with the field-notes thereof, was filed with the State surveyor general on the 4th of May, 1869, and approved by him November 12, 1869. On the 19th of April, 1870, the State of California issued and delivered to Hartwell a certificate of purchase of the land in suit, founded on the last application and survey, which certificate set forth that Hartwell had made part payment of the purchase price and was the purchaser of the land, and that, on making full payment and surrendering the certificate, he should receive a patent of the State for the same. On the 1st of April, 1871, Hartwell sold this certificate to the plaintiff, to whom a patent of the State was issued on the 21st of July, 1876, in accordance with the provisions of the laws of the State relating to swamp and overflowed lands.

Prior to this, however, January 10, 1866, Hartwell filed a preëmption declaratory statement for the land, alleging settlement thereon September 20, 1862, which was formally relinquished October 29, 1873, and cancelled December 8 of that year. No other claim was ever made to the land, under any of the laws of the United States relating to the disposition of the public lands, until the 24th of July, 1876, when the defendant Wallace presented a preëmption declaratory statement therefor to the register of the land office at Stockton, alleging settlement on the 25th of April preceding, which that officer refused to file, endorsing thereon, as his reason for such refusal, that the land had been returned as subject to periodical overflow. Wallace appealed to the commissioner of the general land office, and on the 5th of September, 1876, that officer wrote the register and receiver of the Stockton land office, saying that the land in question was claimed by the State under the first section of the act of July 23, 1866, as having been sold, in good faith, as swamp land, prior to that date, and directing those officers to give notice to the State authorities, to Wallace, and to all other parties in interest, and hold an investigation to determine the said claim of the State. That investigation having been held, the local land officers, on the 8th of February, 1877, decided that the State had no valid claim to the land under the first section of the act of July 23, 1866. The commissioner of the general land office affirmed that decision on the 19th of May, 1877, and further adjudged that the State was not entitled to show the character of the land as swamp and overflowed, under the 4th clause of the 4th section of that act. The State appealed to the Secretary of the Interior, who, on the 28th of December, 1877, overruled the commissioner in that behalf, and directed a hearing to be given to the State on the question of the character of the land, by virtue of the 4th clause of the 4th section of the act.

Pursuant to the decision of the Secretary of the Interior, after notice to all parties in interest, the United States surveyor general held an investigation as to the character of the land, and decided that the land was not in fact swamp and overflowed on the 28th of September, 1850, the date of the

general swamp land act. The decision of the surveyor general was affirmed by the Secretary of the Interior on the 25th of February, 1881, who also adjudged that the land was subject to disposal under the preëmption laws, and that Wallace should be allowed to perfect his preëmption claim thereto. Wallace afterwards complied with the provisions of the preëmption law, and in June, 1882, received a patent to the land from the United States.

After this patent was issued, the State of California applied to the Interior Department to have the land certified over to her, by virtue of the provisions of the first and second clauses of the 4th section of the act of July 23, 1866, and the first and second clauses of section 2488, together with section 2479, of the Revised Statutes. This application was denied by the commissioner of the general land office, April 26, 1883, upon the ground that a patent having been issued to Wallace for the tract, the department had no further jurisdiction over the matter. That decision was affirmed by the Secretary of the Interior, March 3, 1884, upon the same ground.

There is no record in the United States Land Department showing a selection of this land by the State, as swamp and overflowed land, or any certification thereof to the State by the United States, except in so far as the foregoing proceedings show a selection.

The plaintiff insisted in the court below that the land passed to the State of California, as swamp and overflowed land, either under the first clause of section 4 of the act of July 23, 1866, 14 Stat. 218, 219, c. 219, or under the second clause of the same section, both of which clauses are substantially embodied in section 2488 of the Revised Statutes; and that, therefore, by virtue of his patent from the State, he had acquired whatever right the State possessed under either or both of those clauses of the statute. They provide as follows:

"That in all cases where township surveys have been, or shall hereafter be, made under authority of the United States, and the plats thereof approved, it shall be the duty of the commissioner of the general land office to certify over to the State of California, as swamp and overflowed, all the lands

represented as such, upon such approved plats, within one year from the passage of this act, or within one year from the return and approval of such township plats.

" The commissioner shall direct the United States surveyor general for the State of California to examine the segregation maps and surveys of the swamp and overflowed lands made by said State; and where he shall find them to conform to the system of surveys adopted by the United States, he shall construct and approve township plats accordingly, and forward to the general land office for approval."

The Supreme Court of California held that the State never acquired any title to the tract under the first clause of said section 4, because the land was not represented upon the approved township plat as swamp and overflowed, within the meaning of the swamp land acts, the designation " subject to periodical overflow " not being identical with, or equivalent to, the description of lands enuring to the State under those acts; and that the State did not acquire any title under the second clause of the section for the following reasons: " We are of opinion that the surveys and plats made, as in this case, under the acts of 1863 and 1868, on the application of a party desiring to purchase the tract sought to be purchased, are not the segregation maps and surveys referred to in the act of Congress of July 23, 1866, and the section of the Revised Statutes above referred to. Granting the survey and plat made on the application of Hartwell to purchase a specific tract of land (the northwest quarter in controversy) was a segregation map and survey, such as is embraced within the above-quoted clause from the act of 1866, it does not appear that the commissioner gave any direction to the United States surveyor general for this State, as required by the act, or that if such order was given it was complied with, or that any township plat was made under this order, or, if made, that it was approved at the general land office."

It is to these two rulings that error is assigned and argument is principally directed. The first question presented for our consideration, therefore, is this: Was this land represented upon the approved township plat, or did the approved town-

ship survey and plat, including the field and descriptive notes of the survey, represent it as swamp and overflowed land, within the meaning of the act of July 23, 1866? If it was so represented, then, under the first clause of said section 4, it was confirmed to the State, without any certification thereof by the commissioner of the general land office, after one year from the date of the act. *Wright* v. *Roseberry,* 121 U. S. 488; *Tubbs* v. *Wilhoit, ante,* 134.

As held in *Tubbs* v. *Wilhoit, supra,* this section of the statute established rules or methods for the identification of swamp and overflowed lands in California which superseded all previous rules or methods for that purpose. The several rules or methods provided for were intended to meet any emergency that might arise, and thus give to the State all the swamp and overflowed lands within her limits. The method provided in the first clause was but one of several specified in the section. But one thing was required to be shown under this clause — only one kind of evidence as to the character of the lands was necessary — in order to give to the State the right to demand the certification of them over to her as swamp and overflowed lands; and that evidence the United States furnished in the plat of the survey of the township in which the lands were situated. An inspection of the township plat would show whether or not any lands in the township were returned as swamp and overflowed. If they were, that designation was sufficient and conclusive evidence, under the first clause of section 4 of the act, to establish the title of the State to them. But as that particular designation was but one of several methods of identification prescribed by the act, it should not be unnecessarily extended beyond its plain and obvious import. For if lands which, in fact, were swamp and overflowed, were not so designated on the approved plat of the township, the State was not precluded from claiming them as swamp and overflowed, and having them identified by one of the other methods provided by the act. She still had recourse to the methods of identification provided by the second and fourth clauses of the section, and if the lands were in fact swamp could not fail to get them. On the other hand,

the United States were bound by the action of the surveyor if he noted on his survey that the lands were swamp and overflowed, and that survey was approved. We think, therefore, that while the act of July 23, 1866, may be called remedial in its character, yet the particular clause of the statute, operating as it does in the nature of an estoppel against the grantor and not so against the grantee, should not be construed as embracing more than its terms will fairly warrant. In other words, this designation, operating as an estoppel against the United States, should have a strict construction. No lands should be considered as embraced within the terms "swamp and overflowed" by mere implication, simply because they may have been described in other terms which, in some instances, might be equivalent to the terms prescribed by the act. If, in any instance, terms claimed to be equivalent to those prescribed by the first clause of the fourth section of the act of 1866 can be shown by evidence to have reference to lands not contemplated by the swamp land grant, as enuring to the State under that grant, then such terms cannot be considered as equivalent to the terms "swamp and overflowed."

The question before us thus resolves itself into one of the definition of words or terms, rather than one of the interpretation of a statute. To arrive at a proper determination of the question, therefore, it will be useful to refer to some of the adjudications of the Interior Department upon the subject; for the survey of the public lands, being confided to certain officers of that department, the meaning of the descriptive terms used by those officers in performing that duty is best known there. In one sense, the language of the survey is technical, and it should, therefore, be taken according to the acceptation of those most familiar with its use and significance.

In *Wallace* v. *State of California*, 2 Copp's Pub. Land Laws, (1882) 1057, 1058, involving the same land here in controversy, (the decision referred to above as having been made by the Secretary of the Interior on the 28th of December, 1877,) Mr. Secretary Schurz said: "The first clause of the said 4th section of the act of 1866 provides, that in cases where the townships had been surveyed by the United States, and the plats

approved, the lands returned as swamp and overflowed were to be certified to the State without further action; hence, no hearing as to the character of the land is necessary. In the case under consideration, however, the township was surveyed by the United States prior to July 23, 1866, and the land is returned by the surveyor general as subject to 'periodical overflow,' and not as 'swamp and overflowed,' as provided in the statute; hence, it is not subject to certification to the State by virtue of the return of the surveyor general. The State, however, claims the land as swamp. A question is thus raised as to the correctness of the return of the officer, and a hearing is requested, that the facts in the case may be ascertained. I find nothing in either the act of September 28, 1850, or July 23, 1866, which debars the State of this right; on the contrary, it is expressly guaranteed in the 4th clause of the 4th section above quoted."

In *California* v. *United States,* decided May 1, 1885, 3 Land Dec. 521, 524, involving part of section 27, in the same township, it was said: " Again, the approved plat of survey of this township and the return of the deputy have been passed upon by this department in the case of *Wallace* v. *State of California,* involving the northwest ¼ of section 23, which corners upon the section embracing the land in controversy. In that case, it was held that 'the township was surveyed by the United States prior to July 23, 1866,' and the land is returned by the surveyor general as subject ' to periodical overflow,' and not as ' swamp and overflowed,' as provided in the statute; hence, it is not subject to certification to the State by virtue of the return of the surveyor general; and also that where a question is raised as to the correctness of the return of the officer, a hearing should be ordered in accordance with the provisions of the fourth clause of the fourth section of the act of July 23, 1866."

Upon review of the same case, February 5, 1886, 4 Land Dec. 371, it was said: "There can be no question that the returns of the surveyor general did not represent said land as swamp and overflowed within the meaning of the act of September 28, 1850. In addition to the adjudication of this de-

partment in the case of *Wallace* v. *The State of California*, in which it was expressly held that the land in said township was not subject to certification to the State, by virtue of the return of the surveyor general, United States Deputy Surveyor Wallace testified at the hearing as follows: ' Q. Did you consider this land in question swamp land at the time you made that survey? A. No. I considered those distinct from swamp lands; if they had been swamp lands I should have entered it so in my notes.' "

In *California* v. *Fleming*, decided August 7, 1886, 5 Land Dec. 37, 38, involving, among other lands, part of the same quarter section here in dispute, it was said : " The lands in controversy were returned by the surveyor general as ' lands subject to periodical overflow,' and hence were not subject to certification to the State by virtue of the return of the surveyor general."

Those adjudications, covering a consecutive period of nearly nine years, and, so far as can be gathered from the printed reports of the decisions of that department relating to public lands, being the only ones bearing upon the subject, ought to be taken as showing conclusively the meaning attached to the phrase " land subject to periodical overflow," by the officers of the department whose duty it is, and has been, to administer the swamp land grant.

Moreover, if the question be considered in a somewhat different light, viz. as the contemporaneous construction of a statute by those officers of the government whose duty it is to administer it, then the case would seem to be brought within the rule announced at a very early day in this court, and reiterated in a very large number of cases, that the construction given to a statute by those charged with the execution of it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons. For, as said in *United States* v. *Moore*, 95 U. S. 760, 763, " the officers concerned are usually able men and masters of the subject. Not unfrequently they are the draftsmen of the laws they are afterwards called upon to interpret." See *Hastings. &c. Railroad Co.* v. *Whitney*, 132 U. S. 357, 366, and cases there cited ; *Schell* v. *Fauché, ante*, 562.

But we are not disposed to rest our judgment on this branch of the case upon the foregoing propositions alone. We are of opinion that the construction by the Interior Department of the clause of the act of July 23, 1866, which we are now considering, is the proper one. In this connection, we are not unmindful of the rule that the field and descriptive notes of a survey form a part of the survey, and are to be considered along with the plat of the townships to which they relate. *Cragin* v. *Powell*, 128 U. S. 691, 696. As already indicated, it is by reference to the plat, together with the field and descriptive notes of the survey, that it is to be determined whether or not the land will inure to the State, and be confirmed, by virtue of the first clause of section 4 of the act of 1866. An inspection of the field-notes of this section of land showed that, in six different places, in running the lines, the surveyor crossed "sloughs" ranging from 20 to 80′ links in width, all having a westerly or northwesterly course. The descriptive notes showed the land to be level, first rate, " subject to overflow," or "subject to overflow from slough." As a conclusion from those data, the surveyor wrote across the face of that part of the plat embracing the land in controversy, " Land subject to periodical overflow." The third finding of fact states that those designations represented that the body of land to which they applied (and which was colored blue on the plat to distinguish it from other portions of the plat) was " subject to inundation by the overflow of the Calaveras River and its branches, and is thus rendered incapable of being cultivated for the raising of crops, except by means of banks and levees which have been erected to prevent the overflow of the water during the winter and spring months." This general description on the plat of the township must be read in the light of the field-notes of the boundary lines, and the annotations made upon the plat. The Secretary of the Interior in *California* v. *United States*, 3 Land Dec. 521, 523, referring to this same township plat, said : " Upon the margin appears this note, ' The lands represented upon this map as *subject to periodical overflow* can be cultivated and crops raised thereon, as returned by the deputy.' " And at another place he said

that the register "certifies that the only land designated on said official plat as swamp and overflowed land, is situated in the north half of section 5 of said township." Thus showing clearly that the department considered that a radical distinction existed between lands returned as "subject to periodical overflow" and those returned as "swamp and overflowed;" and showing also that these lands were not considered "swamp and overflowed" lands. We think we may take judicial notice of such official statements made by the head of one of the branches of the Executive Department, especially as they relate to the public records under his control. 1 Greenleaf on Ev. § 479; *Jones* v. *United States*, 137 U. S. 202, and authorities there cited.

Now, lands "subject to overflow," or "subject to overflow from slough," or "subject to periodical overflow," are not necessarily such as come within the descriptive terms of those enuring to the State under the swamp land grant. Whether the terms "swamp" and "overflowed" when connected by the particle "and" be taken together as a general term of description for the lands granted by the swamp land act, or whether those terms are separable and refer to two different qualities of lands thus granted, makes little or no difference in this consideration. If the former theory be the correct one, then manifestly the meaning of the phrase is entirely different from the phrase "subject to periodical overflow." And if the latter theory be adopted, still we think there is a marked distinction between the terms "overflowed" and "subject to periodical overflow." The term "overflowed" as thus used, has reference to a permanent condition of the lands to which it is applied. It has reference to those lands which *are* overflowed and will remain so without reclamation or drainage; while "subject to periodical overflow" has reference to a condition which may or may not exist, and which when it does exist is of a temporary character. It was never intended that all the public lands which perchance might be temporarily overflowed at the time of freshets and high waters, but which, for the greater portion of the year, were dry lands, should be granted to the several States as "swamp and over-

flowed" lands. At any rate, the question whether or not lands returned as "subject to periodical overflow" are within the descriptive terms of those granted by the swamp land act — that is, whether they are "swamp and overflowed,"— is a question of fact properly determinable by the land department. It is settled by an unbroken line of decisions of this court in land jurisprudence that the decisions of that department upon matters of fact within its jurisdiction, are, in the absence of fraud or imposition, conclusive and binding on the courts of the country. *Johnson* v. *Towsley*, 13 Wall. 72; *Smelting Company* v. *Kemp*, 104 U. S. 636; *Steel* v. *Smelting Co.*, 106 U. S. 447; *United States* v. *Minor*, 114 U. S. 233; and many other cases. We are of opinion, therefore, that the decision of the land department on a question of the actual physical character of certain lands is not subject to review by the courts. And that consideration is sufficient to dispose of the first assignment of error against the plaintiff in error.

We do not think the second assignment of error can be sustained. The surveys and plats made upon the application of Hartwell to purchase the tract were not the segregation surveys referred to in the second clause of the fourth section of the act of July 23, 1866. As said in *Tubbs* v. *Wilhoit, supra*, 134, that clause "provided for the construction of township plats where none previously existed. It required the commissioner of the general land office to direct the United States surveyor general for California to examine the segregation maps and surveys of the swamp and overflowed lands made by the State, and directed that when he should find them to be in conformity with the system of surveys adopted by the United States he should construct and approve township plats accordingly, and forward them to the general land office for approval." See also *Wright* v. *Roseberry*, 121 U. S. 488, 513, 514. After the United States surveys had been made, there was no necessity for any further survey by the State in order to locate the swamp lands. In fact there could be no state survey after that date of any recognized force.

The segregation maps referred to in that clause were such as were directed by the act of the legislature of California

approved May 13, 1861. (Session Laws of 1861, c. 352, page 355.) That act provided, among other things, as follows:

"SEC. 19. The county surveyors of the several counties of this State shall, immediately after the organization of the board of commissioners, proceed to segregate the swamp and overflowed lands within their respective counties from the high lands in said counties, and make complete maps of all the swamp and overflowed lands within their respective counties, in legal subdivisions of sections and parts of sections, together with a tabular statement of all such lands as have been sold by the State, and under what act the same were sold, of all lands claimed and by whom claimed, and, as nearly as possible, by what title the same are held, and file the said tabular statement in the county recorder's office of their respective counties, and also transmit duplicates of said maps to the surveyor general of the State: *Provided, however,* That it shall be discretionary with the board of commissioners whether land already surveyed and segregated under a former act for the sale and reclamation of swamp and overflowed lands shall be segregated or surveyed under this act."

"SEC. 21. The surveyor general shall compile a general map of the State in duplicate, showing all the swamp and overflowed lands of the State which shall have been returned by the county surveyors as the property of the State, together with the county boundary lines where crossing the same. He shall also enter thereon the number corresponding with the affidavit; he shall also compile from the testimony received, and on file in his office, a general schedule of the swamp lands in the State by their description. He shall also distinguish on said map the lands already sold by the State as swamp and overflowed; he shall prepare a report showing any case in which the swamp lands have been infringed upon by the United States government surveys."

No survey such as described in those sections of the laws of California was ever made of the land in dispute. The surveys that were made upon the application of Hartwell to purchase the tract do not come within that description. They were, in reality, mere private surveys. Moreover, the phrase "seg-

regation surveys," as used in the act of 1866, means such seg-
regation surveys as are defined and described by the aforesaid
act of the legislature of the State, and are made by state
officers; and it would seem, therefore, that whether or not a
survey made by an officer of the State is a segregation sur-
vey, as defined by the act of the state legislature, is one on
which this court will follow the decision of the state court. It
is in reality a construction of a state statute. The Supreme
Court of the State has invariably held such maps or plats not
to be the segregation maps referred to in the act of July 23,
1866. *Sutton* v. *Fassett,* 51 California, 12; *People* v. *Cowell,*
60 California, 400. For these reasons we hold that the second
specification of error cannot be sustained.

There are no other features of the case that call for further
consideration or even special mention. We see no error in
the decision of the Supreme Court of California prejudicial to
the plaintiff in error, and its judgment is

*Affirmed.*