THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY
V. WILLIAM WATSON.

No. 14,546. (87 Pac. 687.)

SYLLABUS BY THE COURT.

1. PUBLIC LANDS—*Railroad Grant—Vesting of Title—Notice to Purchasers.* The act of congress of July 26, 1866, granting to the Union Pacific Railroad Company, Southern Branch (now the Missouri, Kansas & Texas Railway Company), a right of way 200 feet wide through what came to be known as Osage Ceded Lands in this state, was an absolute grant *in præsenti,* vesting title from the date of the passage of the act, and all persons subsequently purchasing any of such lands did so subject to, and with notice of, the railroad company's rights.

2. EVIDENCE—*Location of Road—Approval by the President Presumed.* Under the facts of this case the approval by the president of the United States of the definite location of the Missouri, Kansas & Texas railroad through the lands mentioned will be presumed.

3. TITLE—*Adverse Possession.* Private individuals cannot acquire title by adverse possession to any portion of the right of way named.

Error from Labette district court; THOMAS J. FLANNELLY, judge. Opinion filed November 10, 1906. Reversed.

*John Madden,* and *W. W. Brown,* for plaintiff in error.

*M. E. Williams,* for defendant in error.

The opinion of the court was delivered by

BURCH, J.: The action in the district court was one of ejectment, brought by the railway company for land claimed as a part of its right of way. Relief was denied on the ground that the railway company had never obtained title, while the defendant occupant held title both by chains of conveyance from the United States and by adverse possession.

The facts upon which the judgment is based are either found by the court or agreed to by the parties, and require consideration in the light of certain treaties between the United States and the Osage Indians, acts of the congress of the United States, and decisions of the federal supreme court.

The land in controversy as now surveyed is part of an even-numbered section of what are known as the "Osage Ceded Lands," lying in the southern part of the state. By the treaty of June 2, 1825, between the United States and the Great and Little Osage tribes of Indians a reservation was established which the Indians were entitled to occupy for their own use as long as they chose to do so. On September 29, 1865, another treaty was made between the United States and the same Indian tribes, which was amended in 1866 and finally proclaimed on January 21, 1867. By the first article the Indians granted and sold to the United States a portion of their reservation some fifty by thirty miles in extent, including the land in controversy. The United States agreed to pay $300,000 for the granted territory, to place the purchase-fund to the credit of the Indians in the treasury of the United States, to pay interest upon it at the rate of five per cent. per annum, and to expend the interest for the benefit of the Indians as the secretary of the interior might direct. The same article of the treaty contains the following provision:

"Said lands shall be surveyed and sold, under the direction of the secretary of the interior, on the most

advantageous terms, for cash, as public lands are surveyed and sold under existing laws, but no preemption claim or homestead settlement shall be recognized; and after reimbursing the United States the cost of said survey and sale, and the said sum of $300,000 placed to the credit of said Indians, the remaining proceeds of sales shall be placed in the treasury of the United States to the credit of the 'civilization fund,' to be used, under the direction of the secretary of the interior, for the education and civilization of Indian tribes residing within the limits of the United States." (14 U. S. Stat. at L. p. 687.)

On April 10, 1869, congress adopted a resolution authorizing any *bona fide* settler having certain qualifications and residing upon any portion of the lands ceded to the United States by the Osage Indians by virtue of the treaty of January 21, 1867, to purchase such lands within two years from the passage of the act, in quantity not exceeding 160 acres, at the price of one dollar and twenty-five cents per acre. The resolution contained the following proviso:

"That nothing in this act shall be construed in any manner affecting any legal rights heretofore vested in any other party or parties." (16 U. S. Stat. at L. p. 55.)

The grantors of the defendant settled upon the quarter-sections which include the land in controversy in 1868, but it is agreed they purchased in the year 1870 under the treaty of 1867 and the congressional resolution of 1869. Patents were duly issued, which, however, contained no exceptions of the railroad right of way.

On July 26, 1866, the congress of the United States passed an act (14 U. S. Stat. at L. p. 289) granting lands to the state of Kansas to aid the Union Pacific Railroad Company, Southern Branch, in the construction of a railway and telegraph line from Fort Riley or near that military reservation down the Neosho river to the southern boundary of the state, with a view to the extension of the line through the Indian Territory

Railway Co. v. Watson.

to Fort Smith, Ark. The grant consisted of odd-numbered sections lying within certain limits on each side of the road as it should be definitely located, and provided as follows:

"But in case it shall appear that the United States have, when the line of said road is definitely located, sold any section, or any part thereof, granted as aforesaid, or that the right of preemption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the secretary of the interior to cause to be selected for the purposes aforesaid, from the public lands of the United States nearest to the sections above specified, so much land as shall be equal to the amount of such lands as the United States have sold, reserved, or otherwise appropriated, or to which the right of homestead settlement or preemption has attached as aforesaid, which lands, thus indicated by the direction of the secretary of the interior, shall be reserved and held for the state of Kansas for the use of said company by the said secretary for the purpose of the construction and operation of said railroad, as provided by this act." (§ 1.)

Section 4 of the act reads:

"And be it further enacted, that as soon as said company shall file with the secretary of the interior maps of its line, designating the route thereof, it shall be the duty of of said secretary to withdraw from the market the lands granted by this act, in such manner as may be best calculated to effect the purposes of this act and subserve the public interest."

In addition to land granted to the state of Kansas by way of aid in the construction of the proposed road a right of way was granted to the company itself, not only through the ordinary public lands, but likewise through reserved lands, as appears by the following extracts from the law:

"That the right of way through the public lands be, and the same is hereby, granted to said Pacific Railroad Company, Southern Branch, its successors and assigns, for the construction of a railroad as proposed; and the right is hereby given to said corporation to

take from the public lands adjacent to the line of said road material for the construction thereof. Said way is granted to said railroad to the extent of 100 feet in width on each side of said road where it may pass through the public domain; also all necessary ground for station-buildings, work-shops, depots, machine-shops, switches, side-tracks, turn-tables, and water-stations." (§ 6.)

"That any and all lands heretofore reserved to the United States by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement or other purpose whatever, be, and the same are hereby, reserved and excepted from the operation of this act, except so far as it may be found necessary to locate the route of said road through such reserved lands, in which case the right of way, 200 feet in width, is hereby granted, subject to the approval of the president of the United States." (§ 1.)

The entire grant was made upon the following conditions:

"And be it further enacted, that the grant of lands hereby made is upon condition that said company, after the construction of its road, shall keep it in repair and use, and shall at all times transport troops, munitions of war, supplies, and public stores upon its road for the government of the United States, free from all costs or charge therefor to the government, when required to do so by any department thereof." (§ 3.)

"And be it further enacted, that the United States mail shall be transported on said road, and under the direction of the post-office department, at such price as congress may by law provide; provided, that until such price is fixed by law the postmaster-general shall have power to fix the compensation." (§ 5.)

The grantee accepted the terms of the act, and by a change of name, duly authorized, the plaintiff, the Missouri, Kansas & Texas Railway Company, became entitled to its benefits and subject to its burdens.

It is agreed that the road was constructed, and that since its completion it has been used by the plaintiff in

Railway Co. v. Watson.

the discharge of its duties as a common carrier engaged in state and interstate commerce.

The court found that the road was definitely located prior to 1870, and it is not disputed that on January 8, 1868, the secretary of the interior transmitted to the commissioner of the general land-office a map showing the definite location of the plaintiff's road through the land in controversy and ordered him to instruct the local land-officers to withhold, on account of the railway, lands falling to the grant within the country ceded by the Indians, and that on July 25, 1870, the secretary of the interior transmitted to the commissioner of the general land-office a map and a certificate of the governor of the state of Kansas showing that the road had been constructed and equipped as required by the act of congress.

No approval by the president of the United States of the route as definitely located was offered in evidence.

The defendant attempts to support his right to the land by the fact that it was occupied by the original patentees before the plaintiff's road was definitely located. Before the act of April 10, 1869, the occupation of Osage Ceded Land gave no right to it whatever. Homestead and preemption settlements were expressly forbidden, and the only method of acquisition possible under the treaty of 1867 was by purchase for cash. These were valid restrictions upon the government's power of alienation. (*Wood v. M. K. & T. Railway Co.,* 11 Kan. 323, 346.) There being no law recognizing the rightfulness of the occupation by white men of the Indian land, settlement there was no better than a trespass. The purpose of the act of 1869 was to prevent speculators from acquiring the land and to preserve it for actual settlers who would cultivate and improve it; hence settlement was made a part of the purchaser's qualification, precisely like citizenship in the United States. But until the purchase-price was actually paid in cash no recognizable claim accrued.

By the express terms of the act of 1869 no sale could be made contravening legal rights previously vested in other parties. What, therefore, were the rights of the railway company in 1870, when the defendant's grantors attempted to acquire title? The section being an even-numbered one, it did not pass to the railway company as a part of the land grant by way of aid. Furthermore, it was held by the supreme court of the United States that such grant did not apply to Osage Ceded Lands. (*Missouri, Kansas and Texas Railroad Company v. United States,* 92 U. S. 760, 23 L. Ed. 645; *Leavenworth, etc., R. R. Co. v. U. S.,* 92 U. S. 733, 23 L. Ed. 634.) But the majority opinions in those cases recognize the validity of the grant of a right of way, as distinguished from the grant of lands to aid construction, and this fact was commented on by the justices in the minority as showing the unsoundness of the conclusion of the court relating to the land grant itself. Besides, this court is probably authorized to take notice, without proof, of an addendum to the court's order in the cases cited, not printed in the published report of the decisions, to the effect that the decrees of affirmance in such cases shall not be construed as affecting the right of way of the railroad claimants through the Osage Ceded Lands.

In due time it became necessary for the supreme court of the United States to determine whether the act of July 26, 1866, did grant to the present plaintiff a right of way through the Osage Ceded Lands, and a decision in its favor was rendered in the case of *Missouri, Kansas & Texas R'y Co. v. Roberts,* 152 U. S. 114, 14 Sup. Ct. 496, 38 L. Ed. 377. The opinion reads:

"Certain lands within the present state of Kansas were reserved whilst it was still a territory, and long previously, by the United States, for the use and occupation of the Osage Indians. Such reservation was made by treaty between them and the United States concluded as far back as June 2, 1825, and proclaimed in December following. (7 Stat. [Indian Treaties] 240.) From that time, and continuously thereafter,

the reserved lands were occupied by those Indians until the treaty ceding the lands, or parts thereof, to the United States, concluded in 1866, and proclaimed in January, 1867 (14 Stat. 687), except such portion thereof as was appropriated and used as a right of way by the Missouri, Kansas & Texas Railway Company for its road under the grant of July 26, 1866. Prior to June 6, 1870, that company located its railroad through these reserved lands in Kansas, with the approval of the president, and constructed its road in substantial conformity with the act of congress. The right of way for its road, 200 feet in width, was granted to the company unconditionally, subject only to such approval. The title to the land for the 200 feet in width thus granted vested in the company either upon the passage of the act of congress, July 26, 1866, or upon the construction of the road, and so far as the present case is concerned it does not matter which date be taken.

"The United States had the right to authorize the construction of the road of the Missouri, Kansas & Texas Railway Company through the reservation of the Osage Indians, and to grant absolutely the fee of the 200 feet as a right of way to the company. Though the lands of the Indians were reserved by treaty for their occupation, the fee was always under the control of the government; and when transferred, without reference to the possession of the lands and without designation of any use of them requiring the delivery of their possession, the transfer was subject to their right of occupancy; and the manner, time and conditions on which that right should be extinguished were matters for the determination of the government, and not for legal contestation in the courts between private parties." (Page 116.)

It remains to inquire when the grant to this right of way became effective against subsequent purchasers of land which it crossed. It would be easy to say in this case that after the map of definite location had been filed with the secretary of the interior all subsequent purchasers were obliged to take notice of the railway company's rights. The grant which before identified no specific land then became definite and certain, and vested in the railway company all the rights contemplated by congress to every tract through which the

route of the road passed, as shown by the map filed. But the railway company is entitled to the benefit of the law as it has been declared, which is that the unconditional grant of a right of way 100 feet in width on each side of the road through land subject to the dominion of the United States is a grant *in præsenti,* and that any person subsequently acquiring a portion of such land takes it subject to that right.

The act of July 23, 1866 (14 Stat. at L. p. 210), granting a right of way to the St. Joseph & Denver City Railroad Company, and granting lands in aid of the construction of that road, is almost identical in language, and is identical in legal effect, with the act under which plaintiff claims. One Baldwin acquired whatever rights he possessed to a certain parcel of land in October, 1869. The road was not definitely located through that tract until October, 1871. After the road was built Baldwin sued for damages on account of the appropriation by the railway company of a strip of his land 200 feet wide and 200 rods long. In denying relief the supreme court of the United States said, per Field, J.:

"The act of congress of July 23, 1866, c. 212, makes two distinct grants: one of lands to the state of Kansas for the benefit of the St. Joseph & Denver City Railroad Company in the construction of a railroad from Elwood in that state to its junction with the Union Pacific *via* Marysville; the other of a right of way directly to the company itself. The lands consisted of alternate sections, designated by odd numbers, on each side of the line of the proposed road. The grant of them was subject to the condition that if, at the time the line of the road was definitely fixed, the United States had sold any section or a part thereof, or the right of preemption or homestead settlement had attached to it, or the same had been otherwise reserved by the United States for any purpose, the secretary of the interior should select an equal quantity of other lands nearest the sections designated, in lieu of those appropriated, which should be held by the state for the same purposes. The limitations upon the grant are similar to those found in numerous other grants of land

made by congress in aid of railroads. Their object is obvious. The sections granted could be ascertained only when the routes were definitely located. This might take years, the time depending somewhat upon the length of the proposed road and the difficulties of ascertaining the most favorable route. It was not for the interest of the country that in the meantime any portions of the public lands should be withheld from settlement or use because they might, perhaps, when the route was surveyed, fall within the limits of a grant. Congress, therefore, adopted the policy of keeping the public lands open to occupation and preemption, and appropriation to public uses, notwithstanding any grant it might make, until the lands granted were ascertained, and providing that if any sections settled upon or reserved were then found to fall within the limits of the grant, other land in their place should be selected. Thus settlements on the public lands were encouraged without the aid intended for the construction of the roads being thereby impaired. The language of the act here, and of nearly all the congressional acts granting lands, is in terms of a grant *in præsenti*. The act is a present grant, except so far as its immediate operation is affected by the limitations mentioned. 'There is hereby granted' are the words used, and they import an immediate transfer of interest, so that when the route is definitely fixed the title attaches from the date of the act to the sections, except such as are taken from its operation by the clauses mentioned. This is the construction given by this court to similar language in other acts of congress. *Missouri, Kansas & Texas Railway Co. v. Kansas Pacific Railway Co.*, 97 U. S. 491, 24 L. Ed. 1095; *Leavenworth, Lawrence & Galveston Railroad Co. v. United States*, 92 U. S. 733, 23 L. Ed. 634.

"But the grant of the right of way by the sixth section contains no reservations or exceptions. It is a present absolute grant, subject to no conditions except those necessarily implied, such as that the road shall be constructed and used for the purposes designed. Nor is there anything in the policy of the government with respect to the public lands which would call for any qualification of the terms. Those lands would not be the less valuable for settlement by a road running through them. On the contrary, their value would be greatly enhanced thereby.

"The right of way for the whole distance of the proposed route was a very important part of the aid given. If the company could be compelled to purchase its way over any section that might be occupied in advance of its location, very serious obstacles would be often imposed to the progress of the road. For any loss of lands by settlement or reservation, other lands are given; but for the loss of the right of way by these means no compensation is provided, nor could any be given by the substitution of another route.

"The uncertainty as to the ultimate location of the line of the road is recognized throughout the act, and where any qualification is intended in the operation of the grant of lands, from this circumstance, it is designated. Had a similar qualification upon the absolute grant of the right of way been intended, it can hardly be doubted that it would have been expressed. The fact that none is expressed is conclusive that none exists.

"We see no reason, therefore, for not giving to the words of present grant with respect to the right of way the same construction which we should be compelled to give, according to our repeated decisions, to the grant of lands had no limitation been expressed. We are of opinion, therefore, that all persons acquiring any portion of the public lands, after the passage of the act in question, took the same subject to the right of way conferred by it for the proposed road." (*Railroad Co. v. Baldwin,* 103 U. S. 426, 428, 26 L. Ed. 578.)

The decision in the Baldwin case was approved in the case of *Bybee v. Oregon & California R'd Co.,* 139 U. S., 663, 11 Sup. Ct. 641, 35 L. Ed. 305, in the following language:

"The distinction between a right of way over the public lands, and lands granted in aid of the construction of the road, is important in this connection. As to the latter, the rights of settlers or others who acquire the lands by purchase or occupation between the passage of the act and the actual location and identification of the lands are preserved unimpaired, while the grant of the right of way is subject to no such condition; and in the construction given by this court to a similar grant in *Railroad Company v. Baldwin,* 103 U. S. 426, 26 L. Ed. 578, a person subsequently acquiring any

part of such right of way takes it subject to the prior right of the railroad company." (Page 679.)

The same case was cited with approval when called collaterally in question in the case of *Missouri, Kansas & Texas Railway v. Cook,* 163 U. S. 491, 16 Sup. Ct. 1093, 41 L. Ed. 239, to which, as the title indicates, the present plaintiff was a party. The opinion reads:

"The grant of the lands and the grant of the right of way were alike grants *in præsenti* and stood on the same footing, so that, before definite location, all persons acquiring any portion of the public lands after the passage of the act took the same subject to the right of way for the proposed road. The easement and the lands were afloat until by definite location precision was given to the grant and they became permanently fixed. *Railroad Co. v. Baldwin,* 103 U. S. 426, 26 L. Ed. 578." (Page 497.)

In the case of *Northern Pacific Railway Co. v. Ely,* 197 U. S. 1, 25 Sup. Ct. 302, 49 L. Ed. 639, decided February 20, 1905, the Baldwin case was again approved, as shown by the following quotation:

"It may be added that it was only as to some of the parcels that the filing of the map of definite location and the construction of the railroad preceded the filing of the entries. But we regard the case as falling within the rule holding the grant of the right of way effective from the date of the act. *Railroad Company v. Baldwin,* 103 U. S. 426, 26 L. Ed. 578." (Page 4.)

The conclusion from these authorities, and there are others to the same effect, must be that the plaintiff's title dates from the passage of the act of 1866, and that the defendant's grantors purchased with notice of, and subject to, the plaintiff's rights.

The grant was an absolute grant in present terms of a right of way, not only through the public lands generally, but also through all government reservations between the termini of the road. The railway company was entitled to a route somewhere through each body of reserved land it might encounter. But the public interest might require that the road should not

pass through specific places. Hence, definite location was subjected to the approval of the president of the United States. When the railway company had filed its map of definite location with the secretary of the interior it had done everything required of it to obtain title to its right of way. Having performed on its part, it was the duty of the president to act in the premises and approve or disapprove. No method of indicating approval was prescribed. The railway company was permitted to enter upon the right of way it had chosen, lay its tracks and build its station-houses there, and to occupy it continuously for railway purposes without objection on the part of the government. Hence, in a suit against a party other than the United States, approval by the president must be presumed.

It is argued that the land department of the United States is a special tribunal for determining preliminary questions affecting the rights of parties to enter land and receive patents, and that by issuing patents for the land in dispute without any reservation of a railroad right of way that tribunal adjudged that no such right existed in the plaintiff's favor. When the act granting to the plaintiff its right of way was passed the land affected was not a subject of disposition by the land department of the United States. It was Indian land, and without the jurisdiction of the officials having power under the general land laws to convey portions of the public domain as much as if it had been a military reservation. Before the law authorizing sales to settlers was enacted title had passed out of the United States and was vested in the railway company. The land was then appropriated and dedicated to the special use of a railroad right of way. There was no preliminary question of fact to be investigated or adjudicated.

This case is analogous in principle to that of *Burfenning v. Chicago, St. Paul &c. R'y*, 163 U. S. 321, 16 Sup. Ct. 1018, 41 L. Ed. 175. A soldier's homestead was located upon a townsite, and a patent issued. The law provided that lands within the limits of any in-

corporated town or selected as the site of a city or town should be excluded from homestead and preemption entries. It was contended that by the issuance of the patent it was conclusively determined by the land department that the patentee's rights were not initiated within the limits of any city and that the land was subject to homestead. In denying the validity of this argument the court, through Mr. Justice Brewer, said:

"It has undoubtedly been affirmed over and over again that in the administration of the public land system of the United States questions of fact are for the consideration and judgment of the land department, and that its judgment thereon is final. Whether, for instance, a certain tract is swamp land or not, saline land or not, mineral land or not, presents a question of fact not resting on record, dependent on oral testimony; and it cannot be doubted that the decision of the land department, one way or the other, in reference to these questions is conclusive and not open to relitigation in the courts, except in those cases of fraud, etc., which permit any determination to be reexamined. *Johnson v. Towsley,* 13 Wall. 72, 20 L. Ed. 485; *Smelting Company v. Kemp,* 104 U. S. 636, 26 L. Ed. 875; *Steel v. Smelting Company,* 106 U. S. 447, 1 Sup. Ct. 389, 27 L. Ed. 226; *Wright v. Roseberry,* 121 U. S. 488, 7 Sup. Ct. 985, 30 L. Ed. 1039; *Heath v. Wallace,* 138 U. S. 573, 11 Sup. Ct. 380, 34 L. Ed. 1063; *McCormick v. Hayes,* 159 U. S. 332, 16 Sup. Ct. 37, 40 L. Ed. 171.

"But it is also equally true that when by act of congress a tract of land has been reserved from homestead and preemption, or dedicated to any special purpose, proceedings in the land department in defiance of such reservation or dedication, although culminating in a patent, transfer no title, and may be challenged in an action at law. In other words, the action of the land department cannot override the expressed will of congress, or convey away public lands in disregard or defiance thereof. *Smelting Co. v. Kemp,* 104 U. S. 636, 646, 26 L. Ed. 875; *Wright v. Roseberry,* 121 U. S. 488, 519, 7 Sup. Ct. 985, 30 L. Ed. 1039; *Doolan v. Carr,* 125 U. S. 618, 8 Sup. Ct. 1228, 31 L. Ed. 844; *Davis's Admr. v. Weibbold,* 139 U. S. 507, 529, 11 Sup. Ct. 628, 35 L. Ed. 238; *Knight v. U. S. Land Ass'n,* 142 U. S. 161, 12 Sup. Ct. 258, 35 L. Ed. 974." (Page 323.)

In the case of *Smelting Co. v. Kemp*, 104 U. S. 636, 26 L. Ed. 875, it was said:

"The patent of the United States is the conveyance by which the nation passes its title to portions of the public domain. For the transfer of that title the law has made numerous provisions, designating the persons who may acquire it and the terms of its acquisition. That the provisions may be properly carried out, a land department, as part of the administrative and executive branch of the government, has been created to supervise all the various proceedings taken to obtain the title, from their commencement to their close. In the course of their duty the officers of that department are constantly called upon to hear testimony as to matters presented for their consideration, and to pass upon its competency, credibility, and weight. In that respect they exercise a judicial function, and, therefore, it has been held in various instances by this court that their judgment as to matters of fact, properly determinable by them, is conclusive when brought to notice in a collateral proceeding. Their judgment in such cases is, like that of other special tribunals upon matters within their exclusive jurisdiction, unassailable except by a direct proceeding for its correction or annulment. The execution and record of the patent are the final acts of the officers of the government for the transfer of its title, and, as they can be lawfully performed only after certain steps have been taken, that instrument, duly signed, countersigned, and sealed, not merely operates to pass the title, but is in the nature of an official declaration by that branch of the government to which the alienation of the public lands, under the law, is intrusted, that all the requirements preliminary to its issue have been complied with. The presumptions thus attending it are not open to rebuttal in an action at law. . . . Of course, when we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a case where the department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States, and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them,

and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would in that event be like that of any other special tribunal not having jurisdiction of a case which it had assumed to decide. Matters of this kind, disclosing a want of jurisdiction, may be considered by a court of law. In such cases the objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it was competent to act." (Pages 640, 641.)

In the case of *Steel v. Smelting Co.*, 106 U. S. 447, 1 Sup. Ct. 389, 27 L. Ed. 226, it was said:

"It need hardly be said that we are here speaking of a patent issued in a case where the land department had jurisdiction to act, the lands forming part of the public domain, and the law having provided for their sale. If they never were the property of the United States, or if no legislation authorized their sale, or if they had been previously disposed of or reserved from sale, the patent would be inoperative to pass the title, and objection to it could be taken on these grounds at any time and in any form of action. In that respect the patent would be like the deed of an individual, which would be inoperative if he never owned the property, or had previously conveyed it, or had dedicated it to uses which precluded its sale." (Page 453.)

In the case of *Lake Superior &c. Co. v. Cunningham*, 155 U. S. 354, 15 Sup. Ct. 103, 39 L. Ed. 183, involving a grant of lands to the state of Michigan to aid in the construction of a canal, it was said:

"Counsel for plaintiff in error cite several cases in which, power having been given to the secretary of the interior to determine a question of fact, his determination thereof, as expressed by the issue of a patent, was held conclusive. The latest of those cases is *Barden v. Northern Pacific Railroad*, 154 U. S. 288, 14 Sup. Ct. 1030, 38 L. Ed. 992, in which the rule was thus stated, page 327:

" 'It is the established doctrine, expressed in numerous decisions of this court, that wherever congress has provided for the disposition of any portion of the public lands, of a particular character, and authorizes

the officers of the land department to issue a patent for such land upon ascertainment of certain facts, that department has jurisdiction to inquire into and determine as to the existence of such facts, and in the absence of fraud, imposition, or mistake, its determination is conclusive against collateral attack.'

"That case fully illustrates the extent to which the rule goes. The grant to the Northern Pacific was of lands 'non-mineral,' and it was held that it was a question of fact whether lands were mineral or non-mineral, and that question of fact was for the determination of the land department, and, when determined by it, conclusively settled. But those cases are not pertinent, for here there was no question of fact to be determined. Long prior to any legislation respecting the canal grant the lands granted to the Ontonagon Company had been identified and set apart. The record thereof was in the office of the land department. By that identification and certification those lands were absolutely separated from the public domain, and as fully removed from the control of the land department as though they had been already patented to the state. And whether those lands were or were not returned to the United States, and released from the burden of that grant, was not a question of fact, but one of law, and depended upon the construction to be given to the resolution of the state of Michigan of February 21, 1867." (Page 375.)

So in this case the plaintiff's right of way had been granted to it, identified and set apart before the act of 1869 was passed. The record was in the office of the land department, and by the identification afforded by the plat filed there the land in controversy was as absolutely separated from the public domain and as fully removed from the control of the land department as though it had already been patented to the plaintiff.

From what has been said it must follow that the district court erred in sustaining the defendant's claim of title under the patents issued to his grantors and in denying the plaintiff's claim of title under the act of congress of 1866.

The district court found that the plaintiff had, in

effect, abandoned all claim to that part of its right of way lying more than fifty feet from the center of its track, and that the defendant had become the owner of such land by adverse possession of it under claim of title for more than the statutory period of fifteen years. The facts found, however, are insufficient to devest the plaintiff of its title and right of possession. In the case of *Northern Pacific Ry. v. Townsend,* 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044, it was said:

"In determining whether an individual, for private purposes may, by adverse possession, under a state statute of limitations, acquire title to a portion of the right of way granted by the United States for the use of this railroad, we must be guided by the doctrine enunciated in *Packer v. Bird,* 137 U. S. 661, 669, 11 Sup. Ct. 210, 34 L. Ed. 819, and approvingly referred to in *Shively v. Bowlby,* 152 U. S. 1, 44, 14 Sup. Ct. 548, 38 L. Ed. 331, viz.: 'The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the states for their grants; but whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the states, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee.'" (Page 270.)

The decision of this court must therefore be controlled by the views of the supreme court of the United States respecting the nature of congressional grants of the character of the one in question.

By the act of July 2, 1864 (13 Stat. at L. p. 365), congress created a corporation known as the Northern Pacific Railroad Company and authorized it to locate, construct, furnish, maintain and enjoy a continuous railroad and telegraph line from a point on Lake Superior to a point on Puget Sound. A right of way 400 feet wide through the public lands was conferred, and a land grant was made in aid of construction. Allowing for differences in the character of the country through which the proposed road was to run, the grant

of a right of way and of lands to aid in construction was in all essential respects similar to that made to the Union Pacific Railroad Company, Southern Branch, by the act of 1866. In each case the grant of a right of way was made primarily to promote the general welfare of the people of the United States. It was contemplated that the right of way donated should be devoted to none but railroad uses in the proper sense of the term. But future needs were anticipated. The way was made wide enough to meet the demands of the road in future years, when its course should no longer lie through unbroken wildernesses, or through untilled Indian reservations, and when it should be burdened with the commerce of rich and populous states; and it was intended to secure to the grantee the permanent enjoyment of the entire width of the right of way so long as a railroad of the proper character should be maintained and operated upon it. While the proposed line of the Northern Pacific company was designated a post route and military road, subject to the use of the government for postal, military, naval and other government service, the obligations in these respects were less onerous than those imposed upon the Union Pacific company, since compensation to the Northern Pacific company for its service to the government in matters besides the transportation of mail was contemplated. The nature of the title conferred, the specific duties to the United States and the general public purposes to be subserved were the same for each company; and the fact that one corporation was created by a law of the United States while the other was organized under the laws of the state of Kansas furnishes no principle of discrimination in the interpretation of the two grants.

Patents based upon homestead entries were issued to lands crossed by the Northern Pacific road without excepting its right of way. The patentees cultivated up to the line of the company's snow fences, situated

Railway Co. v. Watson.

fifty and one hundred feet from the track, and thus occupied portions of the right of way for a period of time sufficient to confer title by adverse possession under the laws of the state of Minnesota. The supreme court of Minnesota sustained a claim of title based upon such possession. (*Northern Pacific Ry. Co. v. Townsend,* 84 Minn. 152, 86 N. W. 1007, 87 Am. St. Rep. 342.). In reversing the judgment of the state court the supreme court of the United States said:

"Following decisions of this court construing grants of rights of way similar in tenor to the grant now being considered (*New Mexico v. United States Trust Co.,* 172 U. S. 171, 181, 19 Sup. Ct. 128, 43 L. Ed. 407; *St. Joseph & Denver City R. R. Co. v. Baldwin,* 103 U. S. 426, 26 L. Ed. 578) it must be held that the fee passed by the grant made in section 2 of the act of July 2, 1864. But, although there was a present grant, it was yet subject to conditions expressly stated in the act, and also (to quote the language of the Baldwin case) 'to those necessarily implied, such as that the road shall be . . . used for the purposes designed.' Manifestly, the land forming the right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company. On the contrary, the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right of way or any portion thereof. The substantial consideration inducing the grant was the perpetual use of the land for the legitimate purposes of the railroad, just as though the land had been conveyed in terms to have and to hold the same so long as it was used for the railroad right of way. In effect the grant was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted. This being the nature of the title to the land granted for the special purpose named, it is evident that to give such efficacy to a statute of limitations of a state as would operate to confer a permanent right of possession to any portion thereof upon an individual for his private use, would be to allow that to be done by indirection which could not be done directly, for, as said in *Grand Trunk*

33—74 KAN.

*Railroad v. Richardson,* 91 U. S. 454, 468, 23 L. Ed. 356, 'a railroad company is not at liberty to alienate any part of its roadway so as to interfere with the full exercise of the franchises granted.' Nor can it be rightfully contended that the portion of the right of way appropriated was not necessary for the execution of the powers conferred by congress, for, as said in *Northern Pacific Railroad Co. v. Smith,* 171 U. S. 261, 275, 18 Sup. Ct. 794, 43 L. Ed. 157, speaking of the very grant under consideration: 'By granting a right of way 400 feet in width, congress must be understood to have conclusively determined that a strip of that width was necessary for a public work of such importance.' Neither courts nor juries, therefore, nor the general public, may be permitted to conjecture that a portion of such right of way is no longer needed for the use of the railroad and title to it has vested in whomsoever chooses to occupy the same. The whole of the granted right of way must be presumed to be necessary for the purposes of the railroad, as against a claim by an individual of an exclusive right of possession for private purposes.

"To repeat, the right of way was given in order that the obligation to the United States assumed in the acceptance of the act might be performed. Congress having plainly manifested its intention that the title to and possession of the right of way should continue in the original grantee, its successors and assigns, so long as the railroad was maintained, the possession by individuals of portions of the right of way cannot be treated without overthrowing the act of congress as forming the basis of an adverse possession which may ripen into a title good as against the railroad company.

"Of course, nothing that has been said in any wise imports that a right of way granted through the public domain within a state is not amenable to the police power of the state. Congress must have assumed when making this grant, for instance, that in the natural order of events, as settlements were made along the line of the railroad, crossings of the right of way would become necessary, and that other limitations in favor of the general public upon an exclusive right of occupancy by the railroad of its right of way might be justly imposed. But such limitations are in no sense analogous to claim of adverse ownership for private use.

"As our construction of the act of congress deter-

Railway Co. v. Watson.

mines the question presented for decision, it becomes unnecessary to review the cases which have been called to our attention supporting on the one hand or denying on the other the broad contention that title by adverse possession, under state statutes of limitation, may be acquired by individuals to land within the right of way of a railroad. None of the cases adverted to as holding the affirmative of the proposition even suggest that the rule would be applicable where its enforcement would conflict with the powers and duties imposed by law on a railroad corporation in a given case. As here we find that the nature of the duties imposed by congress upon the railroad company and the character of the title conferred by congress in giving the right of way through the public domain are inconsistent with the power in an individual to acquire, for private purposes, by limitation, a portion of the right of way granted by congress, the cases in question are inapposite." (*Northern Pacific. Ry. v. Townsend,* 190 U. S. 267, 271, 23 Sup. Ct. 671, 47 L. Ed. 1044.)

In February, 1905, the supreme court of the United States reversed the decision of the supreme court of the state of Washington in the case of *Northern Pacific Ry. Co. v. Ely,* 25 Wash. 384, 65 Pac. 555, 54 L. R. A. 526, 87 Am. St. Rep. 766, which involved the precise question now at issue. The reversal was predicated solely upon the authority of the Townsend case. The opinion reads:

"The facts on which the state supreme court proceeded are thus stated: 'It may be conceded, we think, that the right of way which embraces the land in dispute was granted to the Northern Pacific Railroad Company by act of congress in 1864, and that, to the title to the right of way thus granted to the Northern Pacific Railroad Company the Northern Pacific Railway Company has succeeded. It may also be conceded, for the purposes of this case, that the Northern Pacific Railway Company has complied with all the terms and provisions of the act of congress aforesaid, and has constructed its railroad through the whole of the line of road between the points named in the granting act; that a map of definite location was filed October 4, 1880, prior to the acquiring of the title to the land in question by the defendants or their predecessors or

grantors; and that said railroad has been continuously operated since its construction. The defendants, answering, claim title by patent from the United States government. The land was acquired under the preemption and homestead acts, respectively, and all the defendants or their grantors have been in quiet, peaceful, undisturbed and undisputed possession of said land for more than ten years immediately prior to the commencement of this action, many of them for nearly twenty years. Valuable improvements have been made by the defendants, the said land consisting of town lots in the city of Spokane, and having been platted and laid out as additions to the city of Spokane by the defendants or their grantors after acquiring title to the same from the United States government. During all these years no claim whatever to these lands has been made by the appellant. It has stood by and seen improvements made thereon, and, in the case of defendant Brown, an agreement was entered into between him and General Sprague, who was then the general superintendent of the Northern Pacific Railroad Company, that they would plat their lots so that the streets of the addition which the railroad company was dedicating would correspond with and meet the streets which Brown was dedicating to the city of Spokane, and the agreement was carried out by arranging the streets in accordance therewith. These streets have been used by the public for from ten to eighteen years. The testimony shows that, in addition to the improvements which these defendants have made upon their lots, many thousands of dollars have been paid by them for assessments levied upon abutting land for the improvement of streets running through this right of way; that the appellant has never paid these assessments; that they have never been assessed to the appellant and that no question has ever been raised by the appellant as to the right and obligation of the defendants to pay the same. While the record does not show that any of the lands owned by the defendants were deeded to them by the appellant, it does show that the Northern Pacific Railroad Company has deeded to other parties lots in the city of Spokane situated within the 400 feet of right of way, upon which valuable improvements have been made by its grantees.' . . . The supreme court held that the action was barred by the statute of limitations; that the company was estopped from as-

serting title by reason of the circumstances; and that 'where, through the negligence and laches of a railroad company, the occupancy by others of portions of the right of way granted to it by the government has ripened into title by adverse possession, the company cannot set up the defense that the right of way was granted for public purposes only and that it would be against public policy to permit either its abandonment by the company or the acquisition of adverse rights therein by way of estoppel or of the bar of the statute of limitations.'

"As before stated, on the 4th day of May, 1903, the decision of this court in *Northern Pacific Railway Company v. Townsend,* 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044, was announced. We there ruled that individuals could not for private purposes acquire by adverse possession, under a state statute of limitations, any portion of a right of way granted by the United States to a railroad company in the manner and under the conditions that the right of way was granted to the Northern Pacific Railroad Company. At the same time it was not denied that such right of way granted through the public domain within a state was amenable to the police power of the state. And we said: 'Congress must have assumed when making this grant, for instance, that in the natural order of events, as settlements were made along the line of the railroad, crossings of the right of way would become necessary, and that other limitations in favor of the general public upon an exclusive right of occupancy by the railroad of its right of way might be justly imposed. But such limitations are in no sense analogous to claim of adverse ownership for private use.'

"We are not prepared to overrule that decision, and, tested by it, the judgment in this case must be reversed." (*Northern Pacific Railway Co. v. Ely,* 197 U. S. 1, 3, 5, 25 Sup. Ct. 302, 49 L. Ed. 639.)

The supreme court of the United States being the final arbiter in cases of this character, its decisions in the Townsend and Ely cases are controlling. It may be remarked, however, that the doctrine of those cases is not materially different from that upon which the decision of this court in *U. P. Rly. Co. v. Kindred,* 43 Kan. 134, 23 Pac. 112, was made to depend. In the

Kindred case the right of way granted by congress to the Union Pacific Railway Company was under consideration. The opinion reads:

"The company does not own the fee. The validity of the act of congress is not contested, nor is it denied that the railway company obtained a grant of 400 feet through the Indian reservation for its right of way. All that is claimed upon the question of title by the defendants is that the abutting landowners, by cultivation and enclosures, have held adverse possession of a part of the easement, or right of way of the railway company, for a greater length of time than that required by the statute of limitation.

"In *Railway Co. v. Allen*, 22 Kan. 285, 31 Am. Rep. 19, this court decided that where the railway company has only an easement, the proprietor of the soil retains the fee of the land, and his right for every purpose not incompatible with the rights of the railway company. This rule is recognized everywhere. Although the abutting landowners have cultivated and enclosed part of the right of way granted by congress, this possession cannot be considered as hostile or adverse. It must be regarded as permissive only. If the fee of the land belongs to the United States, then the abutting landowners can acquire no title or claim by possession or limitation. (*Smith v. Smith*, 34 Kan. 293, 8 Pac. 385.) If the abutting landowners own the fee of the right of way, they may use the land in any way not inconsistent with the paramount rights of the railway company; but such use will not give them adverse possession so as to confer title." (Page 136.)

The term "easement" was not, perhaps, strictly accurate. The estate granted to the Union Pacific company is corporeal in character rather than incorporeal, and corresponds to the limited fee for particular uses, subject to reverter, described in the Townsend case. But the decision is that whatever the extent of the railway company's ownership its right of way is not exposed to private appropriation by means of adverse occupation.

In view of the decisions quoted the district court erred in holding that the defendant acquired title to

the portion of the plaintiff's right of way in controversy by adverse possession.

The contention of the defendant that the plaintiff's road was not built upon the line of definite location shown by the map filed with the secretary of the interior is contrary to an express finding of fact made by the trial court.

The judgment of the district court is reversed, and the cause remanded with direction to enter judgment for the plaintiff.

All the Justices concurring.