WHALEY v. NORTHERN PAC. RY. CO.

(Circuit Court, D. Montana. April 13, 1908.)

No. 766.

1. PUBLIC LANDS (§ 29*)—HOMESTEAD LAW—LANDS WITHDRAWN FROM ENTRY.
Act June 5, 1872, c. 308, 17 Stat. 226, provided for the survey and sale to actual settlers of not more than 15 townships of the lands in the Bitter Root Valley in Montana, lying above the Lo Lo fork of the Bitter Root river, which had been ceded by the Flathead and other Indians by the Stevens treaty of July 16, 1855, 12 Stat. 975, but expressly provided that "none of the lands in said valley above the Lo Lo fork shall be open to settlement under the homestead and pre-emption laws of the United States." The only subsequent legislation respecting said lands was the amendatory act of February 11, 1874, c. 25, 18 Stat. 15, which ex-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tended the benefit of homestead law to settlers on lands within said 15 surveyed townships. *Held*, that no other lands within the valley above the Lo Lo fork were subject to homestead settlement or entry.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 29.*]

**2. WORDS AND PHRASES—"VALLEY."**

The common understanding of the word "valley" as applied to a mountainous country is as meaning lowlands in contradistinction to mountain slopes and ridges.

**3. PUBLIC LANDS (§ 35*) — HOMESTEAD LAW — REQUISITES OF SETTLEMENT — "RESIDENCE."**

To establish a residence under the homestead law, there must be a combination of act and intent, the act of occupying and living upon the claim, and the intention of making the place a home to the exclusion of a home elsewhere.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 72–77; Dec. Dig. § 35.*

For other definitions, see Words and Phrases, vol. 7, pp. 6151–6161; vol. 8, p. 7788.]

## In Equity.

The object of this suit is to have the Northern Pacific Railway Company adjudged to hold the legal title to a certain tract of land to which it has a patent in trust for complainant.

The allegations of the complainant's bill are substantially as follows: That in November, 1897, complainant settled upon, occupied, and improved the southwest quarter of section 29, township 10 north, of range 18 west, of Montana meridian, in Ravalli county, Mont., containing 160 acres; that the said tract of land is situated in the Bitter Root Valley above the Lo Lo fork creek, on the east side of the Bitter Root river, and that the water from said land flows into the Bitter Root river, and that the land was subject to entry under the homestead laws of the United States; that on July 16, 1855, a treaty was concluded between the United States and the Flathead, Kootenai, and Upper Pend d'Oreille Indians, which said treaty was ratified by the United States Senate on March 8, 1859, and proclaimed by the President on April 18, 1859. 12 Stat. 975. This treaty is generally known as the "Stevens Treaty."

The eleventh article of said treaty is as follows: "Article 11. It is moreover provided that the Bitter Root Valley, above the Lo Lo fork shall be carefully surveyed and examined, and if it shall prove, in the judgment of the President, to be better adapted to the wants of the Flathead Tribe than the general reservation provided for in this treaty, then such portions of it as may be necessary shall be set apart as a separate reservation for said tribe. No portion of the Bitter Root Valley above the Lo Lo fork shall be open to settlement until such examination is had and the decision of the President made known."

Complainant alleges that after the ratification of the treaty and the proclamation by the President on April 18, 1859, all of the land in the Bitter Root Valley above the Lo Lo fork, and including that upon which complainant says he settled under the homestead laws, was placed in reservation by virtue of the said eleventh article of the Stevens treaty, and remained in such state until December 14, 1871, when the reservation was terminated by the President, by executive order dated November 14, 1871, wherein it was recited that "the Bitter Root Valley above the Lo Lo fork, in the territory of Montana, having been carefully surveyed and examined in accordance with the eleventh article of the said Stevens treaty concluded at Hell Gate in the Bitter Root Valley between the United States and the Flathead, Kootenai and Upper Pend d'Oreille Indians, which was ratified by the Senate March 8, 1859, has proved, in the judgment of the President, not to be better adapted to the wants of the Flathead Tribe than the general reservation provided for in said treaty. It is therefore deemed unnecessary to set apart any portion of said Bitter Root Valley as a separate reservation for Indians referred to in said treaty."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

It is alleged that Congress afterwards enacted a law entitled "An act to provide for the removal of the Flathead and other Indians from the Bitter Root Valley in the territory of Montana," wherein it was provided that, as soon as practicable after the approval thereof, the Surveyor General of Montana Territory should cause to be surveyed the lands in the Bitter Root Valley lying above the Lo Lo fork of the Bitter Root river, and that said lands should be open to settlement, and should be sold in legal subdivisions to actual settlers only who had the necessary qualifications to enter land and acquire title thereto, under the pre-emption and homestead laws of the United States, in quantities not exceeding 160 acres to each settler, at the price of $1.25 per acre: Provided, that not more than 15 townships of said land should be subject to the provisions of said act; and also providing that none of the lands in said valley above the Lo Lo fork should be open to settlement under the homestead and pre-emption laws of the United States. Act June 5, 1872, c. 308, 17 Stat. 226.

The bill also alleges that Congress afterwards enacted another law, approved February 11, 1874, entitled "An act to amend an act to provide for the removal of the Flathead and other Indians from the Bitter Root Valley in the territory of Montana, approved June 5, 1872"; and that section 2 of the act last aforesaid reads as follows: "Sec. 2. That the benefit of the homestead act is hereby extended to all the settlers on said lands who may desire to take advantage of the same." Act Feb. 11, 1874, c. 25, 18 Stat. 15.

Complainant sets forth that, under the act last referred to, the Surveyor General of Montana, in 1872, caused a portion of the said Bitter Root Valley to be surveyed, namely, 4 full and 15 fractional townships, which said surveys were approved and the plats filed in the United States land office at Helena; that in making the surveys aforesaid the surveyor confined his surveys to the bottom lands and the low bench lands on each side of the Bitter Root river, and in his field notes represented that it was "impracticable to extend the surveys owing to the rough mountainous country," when, in truth, there were large areas of good arable agricultural lands lying on the east side of the said Bitter Root Valley, and also in the upper or south end of the said valley, and outside of the lands so surveyed in 1872, and which have since been surveyed, platted, and opened to filing and entry to settlers, and much of which has been entered and patents issued therefor.

Complainant says that the commissioner of the General Land Office caused to be prepared a diagram of all the lands in the Bitter Root Valley which had been surveyed in 1872, which diagram was approved by the Commissioner of the General Land Office on the 4th day of March, 1894, and that the purpose and intention of the diagram, which is attached to the bill, was to define the lands comprising said Bitter Root Valley as contemplated by article 11 of the Stevens treaty, and that since the diagram was approved on March 4, 1894, and filed in the General Land Office, the Interior Department has erroneously decided and held that the lands embraced within the exterior lines of said diagram constituted and comprised the entire Bitter Root Valley as contemplated by the terms of article 11 of the Stevens treaty, and that all lands outside of the exterior lines of said diagram are no part of the said Bitter Root Valley, although said lands are so situated that streams flowing through them are tributaries of the Bitter Root river, which flows through the Bitter Root Valley. The bill alleges that in 1901 the government caused to be surveyed certain fractional townships containing large areas of agricultural and timber lands, and situated upon streams which are tributaries of the Bitter Root river, and that the surveys of said lands were approved on March 5, 1903, and that the land office was open to receive filings of settlers upon the said lands on April 16, 1903; that all of the lands just referred to are in the Bitter Root Valley, above the Lo Lo fork, and are a portion of the Bitter Root Valley, within the meaning and intent of article 11 of the Stevens treaty; that on April 16, 1903, having previously settled upon, occupied, and made improvements upon the land heretofore referred to as embraced within his homestead claim, he made the necessary application to enter said land and obtain patent therefor, and delivered the same to the officers of the land office at Missoula, and tendered the necessary fees, but that the officers refused to accept the application and the fees, basing their refusal upon the grounds that the said land was on an odd-numbered section and within the 40-mile limit of the grant made by Congress to the Northern Pacific

Railroad Company July 2, 1864, and therefore not subject to homestead entry. Complainant alleges that within the proper time he appealed from the action of the register and receiver of the local land office at Missoula to the Commissioner of the General Land Office, and that the matter came on regularly for hearing, but that the Commissioner of the General Land Office affirmed the decision of the register and receiver, and that thereafter he appealed to the Secretary of the Interior, but that he also affirmed the act of the local land office in refusing to receive the filing; that thereafter a motion for a review was made before the Secretary of the Interior, but that that was denied. He then alleges that all the rulings made against him were erroneous and wrongful; and that the Secretary of the Interior and the Commissioner of the General Land Office exceeded their jurisdiction in ordering and having prepared the diagram made part of the bill, and in deciding that the lands included within the exterior boundaries shown on said diagram comprised all the lands in the Bitter Root Valley above the Lo Lo fork. It is alleged that the parties to the Stevens treaty, at the time the same was signed and concluded, considered, understood, and intended that the words "the Bitter Root Valley above the Lo Lo fork," mentioned and contained in article 11 of the Stevens treaty, should and did embrace all of the country and lands lying above the Lo Lo fork, and from which the waters flowed into and were tributary to the Bitter Root river. It is alleged that on December 19, 1905, patent for the land involved in this suit was issued to the Northern Pacific Railroad Company, but that in equity and good conscience complainant is entitled to the land.

The respondent, Northern Pacific Railway Company, by answer, denies that the complainant has ever settled upon the land described in his bill in good faith, and alleges that he is endeavoring to obtain valuable timber land illegally, and under guise of the homestead law. Defendant says that the land involved is not situated in the Bitter Root Valley; that it has no value substantially for agriculture, but is heavily timbered and is valuable for its timber. It is denied that the land reserved by proclamation of the President on April 18, 1859, included the lands herein involved. Defendant says that the said lands are substantially 5,000 feet above sea level, and more than 1,600 feet above the Bitter Root river, and that they are in a high, mountainous country, which is part of the mountain range forming the divide between the Bitter Root river west thereof and Rock creek on the east; and that the country is broken and rugged, and is not a part of the Bitter Root Valley in any sense of the word; that the lands are mountain lands. It is alleged that the Bitter Root Valley referred to in the treaty had been carefully surveyed and examined, in accordance with the requirements of the Stevens treaty, and that the surveys made in 1872 did not include the lands in question, because the lands beyond the boundaries of the survey and plat were of the general character described by the respondent. Respondent sets up that the decision of the Interior Department was correct, and that, by the terms of the treaty and the proclamations of the President, the limits of the Bitter Root Valley were determined, and that it has been adjudicated that the term "valley" in the treaty referred to the character of lands, and those only, shown on the plat annexed to the complainant's bill. Defendant admits that complainant made the application to enter the lands, as he states, admits that patent was issued to it, and prays to be dismissed.

The replication denies the affirmative matter pleaded by the defendant.

The testimony was taken before an examiner and filed with the court. Thereafter argument was had, and the matter submitted for determination.

Woody & Woody, for complainant.

C. W. Bunn and W. Wallace, Jr., for defendant.

HUNT, District Judge (after stating the facts as above). A careful examination of the Stevens treaty, the acts of Congress, and decisions of the Supreme Court of the United States applicable to the facts of this case leads me to these conclusions:

The most favorable attitude that can be assumed in complainant's behalf is that since April 16, 1903, he has in good faith claimed a

homestead upon land situate in the Bitter Root Valley above the Lo Lo fork, and that his claim is not within the 15 townships which, by the act of Congress of 1872 (infra), had been opened for settlement.

By article 11 of the Stevens treaty, made in 1855, no portion of the Bitter Root Valley above the Lo Lo fork was to be open for settlement until the examination and survey had been made, as required by the terms of the treaty, and until the decision of the President concerning the adaptability of the valley to the wants of the Flatheads had been made known. Act July 16, 1855, 12 Stat. pp. 975–979.

On November 14, 1871, the President issued his proclamation to the effect that the Bitter Root Valley above the Lo Lo fork had been surveyed, and expressing his judgment that it was not better adapted to the wants of the Flatheads than the general reservation set apart by the treaty.

Upon June 5, 1872, Congress passed another act to provide for the removal of the Flathead and other Indians from the Bitter Root Valley. Act June 5, 1872, c. 308, 17 Stat. 226.

Section 2 of this last aforesaid act is all-important. After providing for a survey of 15 townships, it expressly provides that none of the lands in said valley above the Lo Lo fork shall be open to settlement under the homestead and pre-emption laws of the United States. In my judgment, the language of this act is unmistakably clear and comprehensive in its words of exclusion, so that, unless there is later legislation which entitles this complainant to claim rights to lands outside of the 15 townships as a homesteader, it is determinative, and he must fail in his suit. I quote the section in full:

"Sec. 2. That as soon as practicable after the passage of this act, the Surveyor General of Montana Territory shall cause to be surveyed, as other public lands of the United States are surveyed, the lands in the Bitter Root Valley lying above the Lo Lo fork of the Bitter Root river; and said lands shall be open to settlement, and shall be sold in legal subdivisions to actual settlers only, the same being citizens of the United States, or having duly declared their intention to become such citizens. said settlers being heads of families, or over twenty-one years of age, in quantities not exceeding one hundred and sixty acres to each settler, at the price of one dollar and twenty-five cents per acre, payment to be made in cash within twenty-one months from the date of settlement, or of the passage of this act. The sixteenth and thirty-sixth sections of said lands shall be reserved for school purposes in the manner provided by law. Town-sites in said valley may be reserved and entered as provided by law: Provided, that no more than fifteen townships of the lands so surveyed shall be deemed to be subject to the provisions of this act: And provided further, that none of the lands in said valley above the Lo Lo fork shall be open to settlement under the homestead and pre-emption laws of the United States. An account shall be kept by the Secretary of the Interior of the proceeds of said lands, and out of the first moneys arising therefrom there shall be reserved and set apart for the use of said Indians the sum of fifty thousand dollars, to be by the President expended, in annual installments, in such manner as in his judgment shall be for the best good of said Indians, but no more than five thousand dollars shall be expended in any one year."

Now, the only later act appears to be that of February 11, 1874 (Act Feb. 11, 1874, c. 25, 18 Stat. 15); but this cannot avail complainant, as it is plainly limited in its application to the 15 townships that had been thrown open for settlement under the act of 1872. The court can imply no meaning from the letter of the act of June 5, 1872,

whereby homestead claims may be made to lands not within the 15 townships thrown open to settlement, for the language, being unambiguous, will not bear such - construction.

Regarding the complainant, therefore, as bound by the act of 1872, as I read and interpret it, his bill must be dismissed, and it will be so ordered.

As the foregoing conclusion disposes of the case, discussion of the question whether the particular lands filed upon by complainant on April 16, 1903, were embraced within the words "the Bitter Root Valley above the Lo Lo fork," as used in the Stevens treaty, would be supererogation. The student of the history of the treaties with the Salishan and other Indians will find much of interest upon the treaty generally by reading the life of Isaac I. Stevens, by Hazard Stevens, where the colloquies between the chiefs and Governor Stevens at Hell Gate are given with considerable detail. Volume 2, c. 31. Mention of the scope of the treaties is also made in Reverend Father Palladino's book, "Indian and White in the Northwest."

It is certain that the definition of what is the valley above the Lo Lo fork given to the words as used in the treaty by the Department of the Interior restricts the valley to the area of lowlands or depressions of considerable size, with bottoms of gentle slope as compared to the sides; that is to say, the valley is defined to be the space inclosed between the ranges of mountains. Under either of these commonly accepted definitions, the lands involved in this suit have been excluded from the valley lands; and decision of where the valley ends and where the range of mountains began became one of fact to be ascertained by the Interior Department, as does decision of what are swamp lands. Heath v. Wallace, 138 U. S. 573, 11 Sup. Ct. 380, 34 L. Ed. 1063. True, in construing a treaty had by the United States with Indians, we must always consider the words used by their plain import; yet, doing this, the common understanding of the word "valley" is to look upon it as meaning lowlands, in contradistinction to mountain slopes and mountain ridges.

Again, in reading the whole Stevens treaty, it is to be noticed that in article 1, "the main ridge of the Rocky Mountains" is referred to, and reference is had to "the divide" between certain streams, and, again, to "the source of main branch of the Jocko river." As these several descriptive words also have commonly accepted definitions, well known by Indians, as by whites, it would seem to be but just to assume that when the words "Bitter Root Valley" were used in article 11, they were employed as much with relation to their ordinary significance as were the words "main ridge" or "divide" or "source." If this reasoning is fair, then the contention that there has been a misinterpretation of the treaty throughout these many years must fail, and the evidence of the Indians concerning the scope of the treaty is irrelevant.

Lastly, complainant has made a very weak showing under the homestead laws of the United States. It would be a very severe strain upon the liberality of the homestead act to extend its protection to complainant, who really never made an earnest effort to establish his actual home upon the place to the exclusion of any other home. He seems to have had a notion that "representation" would do, and that

this was possible by occasional visits to the place, followed by some slight evidences of occupancy and cultivation. I do not believe that such acts constitute that good faith demanded of one who claims as a homesteader. Inhabitancy is always required, and surely it is not a compliance with the law for a man to file on a tract of land with no intention of making it his home, with no purpose of living there, with no intention of cultivating the place and of acquiring it for a place to reside in. Occasional visits made for a day or two every few months, when such visits are made solely for the purpose of complying technically with the law, do not constitute a compliance with the statute. To establish a residence under the homestead laws, there must be a combination of act and intent, the act of occupying and living upon the claim and the intention of making the place a home to the exclusion of a home elsewhere.

Tested by these demands of the law, under the facts and circumstances adduced in the record, complainant's showing is so weak that he could not complain if relief were denied to him, solely upon the ground that he has never tried in good faith to comply with the homestead laws.